83 P.3d 1094

**James D. SPEROS, a married man, dealing with his sole and separate property, Plaintiff–Appellant,**

v.

**Kristine J.P. YU, a/k/a Kristine Yu and John Doe Yu, wife and husband, Defendants–Appellees.**

**Kristine J.P. Yu, a/k/a Kristine Yu, a/k/a Kristine Yu, a single woman, Counterclaimant–Appellee,**

v.

**James D. Speros and Jane Doe Speros, husband and wife, and Sky King, Inc., an Arizona corporation, Counterdefendants–Appellants.**

No. 1 CA–CV 02–0736.

Court of Appeals of Arizona, Division 1, Department E.

Feb. 3, 2004.

* The Honorable David R. Cole, a judge of the Maricopa County Superior Court, was authorized to participate as a Judge *Pro Tempore* of the Court of Appeals by order of the Chief Justice of the Arizona Supreme Court pursuant to Article 6, Section 31 of the Arizona Constitution and A.R.S. § 12–145 *et seq.* (2003).

Gust Rosenfeld, P.L.C. By Charles W. Wirken and Scott A. Malm, Phoenix, Attorneys for Appellant.

Steptoe & Johnson, LLP By Bennett Evan Cooper and Stacey F. Gottlieb, Phoenix, Attorneys for Appellee.

## OPINION

IRVINE, Judge.

¶ 1 James Speros appeals the trial court's summary judgment awarding a portion of an alley known as the "South Alley" to Kristine Yu.[1] We hold that the trial court correctly found that the South Alley was not "the exterior boundary of a subdivision or other tract of land," so title to the abandoned alley was properly divided between the owners of the abutting lands. Therefore, we affirm.

## FACTUAL AND PROCEDURAL HISTORY

¶ 2 This action arises out of a dispute regarding the South Alley, which separates Speros's and Yu's lots within the Hood Homes Subdivision. The Hood Homes Subdivision was originally developed in 1947. The original plan divided land north of Northern Avenue and east of 12th Street.

---

1. See map attached as Appendix A.

Lots 1, 2, 11 and 12 faced Northern Avenue. A north-south alley ran between Lots 2 and 11, and continued north through the subdivision. Lot 10 was to the north of both Lots 11 and 12, and east of the alley. Lot 9 was north of Lot 10. Lot 3 was to the north of both Lots 1 and 2, and west of the alley. The portion of the north-south alley lying between Lots 3 and 10 was referred to below as the West Alley.

¶3 In 1955, the owners of Lots 10, 11 and 12, the Hartes, quit-claimed to Maricopa County the south twenty feet of Lot 10 (referred to below as the South Alley) and the northwest corner of Lot 11 (the Triangle Alley) for alley purposes, and the south seven feet of Lots 11 and 12 for roadway purposes.[2] The City of Phoenix acquired ownership of the South Alley in 1958 when it annexed the entire area.[3]

¶4 In 1981, Kwock Fai ("Bill") Yu purchased Lots 9, 10, and 12, as well as the east 20.48 feet ("the east strip") of Lot 11. In 1991, Bill Yu quit-claimed all of this property to the appellee, Kristine Yu ("Yu"). Yu simultaneously took over the ownership and operation of an already existing Chinese restaurant located on Lot 12. Like the restaurant's prior owners, Yu continued to use both the South Alley and the east strip of Lot 11 in conjunction with restaurant operations.

¶5 In 1997, Yu conveyed Lots 9 and 10 to Speros's company, Sky King, Inc., which already owned the west part of Lot 11. Yu believed that Schedule B to the deed preserved her right to use the South Alley, and she continued to use the South Alley accordingly. The parties agree that this conveyance did not affect Yu's continued ownership and use of the east strip of Lot 11.

¶6 In July of 2000, the Phoenix City Council adopted a resolution abandoning the South Alley, West Alley, Triangle Alley, and southeast corner of Lot 3. In September of 2000, Sky King conveyed Lots 9, 10, and its portion of Lot 11 to Speros.

¶7 In January of 2001, the City of Phoenix quit-claimed the South Alley, east half of the West Alley, and the Triangle Alley to Speros. Two months later, Speros notified Yu of the quit-claim and ordered Yu to remove all improvements from the South Alley and to refrain from further use of the South Alley. Yu refused, and Speros sued to quiet title to the South Alley. Yu counterclaimed, requesting quiet title to the entire south half of the South Alley. In the alternative, Yu claimed a private way of necessity and prescriptive easement in the South Alley.

¶8 In summary judgment pleadings, Yu did not seriously dispute Speros's ownership of the Triangle Alley or east half of the West Alley. The major dispute was over ownership of the South Alley. Following a hearing on Speros's motion for summary judgment, the trial court ordered that the entire north half of the South Alley and the portion of the South Alley adjacent to Speros's portion of Lot 11 be awarded to Speros. The court awarded the southern ten feet of the South Alley that was adjacent to Lot 12 and Yu's portion of Lot 11 to Yu. Following the trial court's denial of Speros's motion for reconsideration and the entry of final judgment, Speros timely appealed.[4] This Court has jurisdiction pursuant to Arizona Revised Statutes ("A.R.S.") section 12–2101(B) (2003).

**DISCUSSION**

¶9 The sole issue in this appeal is the trial court's method of dividing the South

2. The parties agree that the Hartes owned Lots 10 and 11. Because the 1955 Quit Claim deed also transferred the south seven feet of Lot 12 to the County, it appears that the Hartes also owned Lot 12.

3. The maps introduced by the parties also show that at some point an east-west alley was created from the north parts of Lots 1 and 2 to connect to the West Alley and the South Alley. The record does not show when or how this alley came to exist, but it appears that the Triangle Alley was conveyed to allow traffic to easily move from east to west behind the lots facing Northern Avenue. The maps also show that the portion of the north-south alley running between Lots 2 and 11 has been abandoned. The details surrounding these alleys are not relevant to the dispute before us.

4. The final judgment also included rulings against Yu's claims to an easement by necessity and an easement by prescription. She did not appeal these determinations.

Alley. Speros argues that he is entitled to ownership of the entire South Alley and that the trial court applied the incorrect subsection of Phoenix City Code ("P.C.C.") section 31–64(c) (2001) in making its determination. He argues that the court should have applied subsection (c)(1), rather than subsection (c)(3).

¶ 10 In response, Yu contends that the trial court appropriately divided the South Alley by applying subsection (c)(3). Yu also argues that the trial court's order avoids a "miscarriage of justice" by ensuring that Yu can continue to operate her restaurant via access to the South Alley. The record reflects that Yu's restaurant accesses its utilities, water, and sewage from sources located in or beneath the alley and that the restaurant's emergency exit and deliveries also filter into the alley. Cutting off all alley access would seemingly render Yu's business inoperable. Yu argues such a result would be contrary to the general purposes of the legal regulation of subdivisions, which include the insuring of "adequate streets, utilities . . . and livable surroundings." *Transamerica Title Ins. Co. v. Cochise County,* 26 Ariz.App. 323, 327, 548 P.2d 416, 420 (1976). For these reasons, Yu asks us to affirm.

■ ¶ 11 Because this appeal presents a pure question of law, we review de novo the trial court's decision. *See Files v. Bernal,* 200 Ariz. 64, 66, ¶ 2, 22 P.3d 57, 59 (App. 2001) ("Because the superior court's decision in this case involved the interpretation of an ordinance, we review that interpretation de novo.").

¶ 12 Phoenix City Code § 31–64(c) provides as follows:

When in the discretion of the City Council a public roadway owned by the City, or a portion of such roadway, is no longer necessary for public use as a roadway, the City Council may dispose of or use the same as follows:

. . .

(c) The City Council may resolve that such roadway or portion thereof be vacated, and

thereupon title to such roadway or portion thereof shall vest, subject to the same encumbrances, liens, limitations, restrictions, and estates as exist on the land to which it accrues, as follows:

(1) In the event that a roadway which constitutes the exterior boundary of a subdivision or other tract of land is vacated, title to the roadway shall vest in the owners of the land abutting the vacated roadway to the same extent that the land included within the roadway, at the time the roadway was acquired for public use, was a part of the subdivided land or was a part of the adjacent land.

(2) In the event that less than the entire width of the roadway is vacated, title to the vacated portion shall vest in the owners of the land abutting such vacated portion.

(3) In the event that a roadway bounded by straight lines is vacated, title to the vacated roadway shall vest in the owners of the abutting land, each abutting owner taking to the center of the roadway, except as provided in paragraphs (1) and (2) of this subsection. In the event that the boundary lines of abutting lands do not intersect such roadway at a right angle, the land included within such roadway shall vest as provided in paragraph (4) of this subsection.

(4) In all instances not specifically provided for, title to the vacated roadway shall vest in the owners of the abutting land, each abutting owner taking that portion of the vacated roadway to which his land, or any part thereof, is nearest in proximity.

(5) No portion of a roadway upon vacation shall accrue to an abutting roadway.[5]

¶ 13 The critical issue here turns on the phrase in subsection (c)(1), "exterior boundary of a subdivision or other tract of land." The parties agree that the South Alley is not the exterior boundary of a subdivision. Nevertheless, Speros contends that the South Alley constitutes an "exterior boundary of a

---

5. The language of the Phoenix ordinance is essentially the same as the state statute applicable to all city, town and county roadways. *See* A.R.S. § 28–7205.

... tract of land" so the trial court erred by applying subsection (c)(3) instead of (c)(1) in dividing the South Alley. By its terms, subsection (c)(3), which divides an abandoned roadway between the owners of the abutting land, does not apply when subsection (c)(1) applies.

¶ 14 Speros argues that a "tract" includes a "lot," citing the Phoenix City Code's definition in its subdivision ordinance of "lot" as "piece, tract, or parcel of land separated from other pieces or parcels by description, as in a subdivision or on a record survey map, or by metes and bounds, for purposes of sale, lease, or separate use and abutting or having legal access to a public street." P.C.C. § 32–3 (2001). Because Lot 10 is by definition a tract of land, Speros maintains, "the only remaining question is whether the South Alley was the exterior boundary of Lot 10 at the time that the South Alley was acquired for public use." He asserts this is apparent because the Hartes transferred the south twenty feet of the lot. Speros believes that the trial court's conclusion that the South Alley was an interior boundary of the subdivision incorrectly eliminates from the statute the term "other tract of land," and that (c)(1) applies to any tract of land, even within a subdivision. He further argues that "exterior" has no independent meaning, so the only issue is whether a roadway is the boundary of a tract.

¶ 15 Yu responds that the trial court correctly found that the South Alley was not an exterior boundary of a subdivision within the meaning of (c)(1), but an interior boundary of the subdivision that separated two subdivision lots. Yu argues that Speros's interpretation would render the ordinances' specification of "exterior boundary of a subdivision" superfluous because the meaning of subsection (c)(1) would be the same whether "subdivision" was included or not, i.e., it would mean "the exterior boundary of a tract of land." Yu finally argues that a division of the South Alley is the most fair and just to the parties because when each of the parties bought land in the subdivision the South Alley already existed and provided access to the restaurant's lot.

¶ 16 "Our primary goal in construing a statute is to find and give effect to legislative intent." *Scruggs v. State Farm Mut. Auto. Ins. Co.*, 204 Ariz. 244, 248, ¶ 17, 62 P.3d 989, 993 (App.2003) (citation omitted). When the language of the statute is clear, we must follow its direction. *See In re Maricopa County Superior Court No. MH 2001–001139*, 203 Ariz. 351, 353, ¶ 12, 54 P.3d 380, 382 (App.2002) ("If the statute's language is clear and unambiguous, we give effect to that language and do not apply any other rule of statutory construction."). When interpreting a statute, each word or phrase must be given meaning so that no part is rendered void, superfluous, contradictory or insignificant. *State v. Superior Court (Kerr–McGee Corp.)*, 113 Ariz. 248, 249, 550 P.2d 626, 627 (1976).

¶ 17 Although both parties present their interpretation of the ordinance, neither party submits any legislative history to explain its meaning or purpose. The ordinance and the comparable state statute have been on the books for many years, *see* 1961 Ariz. Sess. Laws, ch. 105, § 105 (adding A.R.S. § 18–502(3), predecessor to A.R.S. § 28–7205); P.C.C. § 35–76 (1962 and Supp. 5–66), but we have not found any court decision interpreting them. We conclude that Yu's interpretation better reflects the actual language of the ordinance and reasonably furthers the policies expressed in subsection (c).

¶ 18 "Tract" is not defined in the City Code. Although in the subdivision ordinance a "lot" may include a "tract ... separated from other pieces or parcels by description, as in a subdivision," P.C.C. § 32–3, the ordinance does not similarly define "tract" as being a "lot." Indeed, the subdivision ordinance repeatedly refers to a subdivision being formed from a "tract." *See* P.C.C. §§ 32–8 (development master plan for the tract); 32–16 (zoning of the tract); 32–26 (standards for the tract to be developed). Therefore, it is apparent that "lot" and "tract" are not synonymous.

¶ 19 The varied use of the term "tract" reflects the fact that "tract" is actually a broad term that defies simple definition. One dictionary defines it as both "a region or stretch (as of land) that is usu[ally] indefi-

nitely described or without precise boundaries," and "a precisely defined or definable area of land." *Webster's Third New International Dictionary* 2421 (1976). A related dictionary similarly defines a "tract" as either "an indefinite stretch of land" or "a defined area of land." *Webster's New Collegiate Dictionary* 1237 (1976). A legal dictionary defines "tract" as a "specified parcel of land." *Black's Law Dictionary* 1499 (7th ed.1999). The version of that dictionary that was current when the ordinance was adopted is even less precise: "TRACT. A lot, piece or parcel of land, of greater or less size, the term not importing, in itself, any precise dimension." *Black's Law Dictionary* 1665 (4th ed.1951). The next edition used this definition, but added that the "term generally refers to a large piece of land." *Black's Law Dictionary* 1338 (5th ed.1979).

■ ¶ 20 Given the vagueness inherent in these definitions, we believe the terms "tract" and "other tract" cannot be defined in isolation, but must be considered in their context. If legislative intent is not clear the meaning of doubtful words may be determined by reference to the meaning of accompanying words. *City of Phoenix v. Yates,* 69 Ariz. 68, 208 P.2d 1147 (1949); *Liristis v. American Family Mut. Ins. Co.,* 204 Ariz. 140, 61 P.3d 22 (App.2002). The most important accompanying word in (c)(1) is "subdivision." We cannot agree with Speros that the term "subdivision" is merely a subset of the broader concept "tract of land." To interpret subdivision in that way would be to read the term out of (c)(1), which is contrary to the previously cited rule that each word in a statute is to be given meaning.

■ ¶ 21 The subsection refers to "exterior boundary of subdivision or *other* tract of land." In this context, we believe "other tract of land" means land that is not a subdi-

vision. The use of the word "other" in (c)(1) indicates a legislative intent to distinguish between subdivisions and non-subdivisions. *See State v. Tsinnijinnie,* 206 Ariz. 477, 479, ¶ 13, 80 P.3d 284, 286 (App.2003) ("This use of the word 'other' means that the second sentence will apply to all sentences for dangerous crimes against children *except* [the two previously listed]. . . ." (Emphasis in original.)). Interpreting "other tract of land" in this way gives meaning to both parts of the phrase "subdivision or other tract of land." [6]

¶ 22 We believe, however, that by having the word "exterior" modify both "subdivision" and "other tract of land," the legislature recognized some common feature of a subdivision and a non-subdivided tract that caused it to treat roadways on their exterior boundaries differently than interior roadways. After carefully reviewing the applicable statutory language, we conclude that for purposes of subsection (c)(1) the common feature of a subdivision and a tract of land other than a subdivision is that at some point each was regarded as a unit, either because of common ownership or some other unifying feature.

¶ 23 Under the City Code, a "subdivider need not be the owner of the property . . . but must present evidence of his authority to" apply for and initiate proceedings for the subdivision of the land. P.C.C. § 32–3 (2001). Similarly, while the ordinary meaning of "tract" is that it can be either an undefined or a specifically defined stretch or area of land, the implication in either definition is that a tract will consist of connected lands that in some way are subject to common control or use. A contiguous area of land with a single owner may be a "tract," but we do not believe that the same area of land divided between different owners who do not have a common purpose would be

6. In other contexts the word "other" is interpreted differently. Under the *ejusdem generis* rule of construction, the use of the word "other" in a general phrase following an enumeration of particular classes of things may indicate that the general words include only others of like kind or character. *Yates,* 69 Ariz. at 73–74, 208 P.2d at 1150. Subsection (c)(1), however, does not contain a list or series of specific things, but simply refers to "subdivision" followed by the more

general phrase "other tract of land." Therefore, *ejusdem generis* does not apply. *See Bilke v. State,* 206 Ariz. 462, 465, ¶ 13, 80 P.3d 269, 272 (2003). ("The Legislature did not create in A.R.S. § 12–2101(G) a list of specific or similar things from which this court can infer an intention to narrow the subsequent general class of 'other proceedings.' Thus, the *ejusdem generis* rule does not apply.")

described as a single "tract." A common purpose or use is the common characteristic of a "subdivision or other tract of land" for purposes of (c)(1) that justifies treating roadways on their exterior boundaries in a similar manner.

¶ 24 A subdivision has been divided on plat maps in a way that gives consideration to the interrelationship between the different parcels within the subdivision. To the extent roadways exist within a subdivision we believe it is reasonable to regard them as benefitting more than a single lot. Ordinarily these roadways are laid out on the original plat map of the subdivision, as was the north-south alley (including the West Alley) in the Hood Homes Subdivision. If these original roadways are abandoned, they are divided according to the terms of subsection (c)(3), rather than (c)(1), because they are not exterior boundaries of the subdivision. Roadways within the subdivision that are dedicated to public use after the original platting will be treated in the same way under the ordinance because they also are not exterior boundaries of the subdivisions. In some respects, these roadways, including the South Alley, show that later owners of the property sought to effectively amend the plat map by dedicating new roadways or alleys within the subdivision.

¶ 25 The ordinance reasonably distinguishes between a roadway that forms the exterior boundary of an area of land and a roadway that is within either a subdivision or some other tract of land. Land transferred by a landowner for a roadway on the exterior boundary of the tract is intended to provide access from outside the tract to the originating land itself, so it is reasonable for lands constituting an abandoned roadway to be returned to whoever now owns that adjacent property. A roadway that is built within a tract, however, may have a broader purpose. Such a roadway would not merely provide access to the area, lot or parcel from which it is carved out, but would provide access within the tract and between different parts of the tract. Over time the ownership of the abutting properties could change, and even be further divided, yet the benefits to the tract itself from the improved access would

remain. The same is true of a roadway running through the interior of a subdivision. A landowner who conveys land within a subdivision for roads or alleys will usually be improving access to more than just his own lot. He will be improving access to other properties as well.

¶ 26 We reject Speros's assertion that the term "exterior" has no meaning because only one type of "boundary" exists. Speros argues that the trial court incorrectly found the South Alley to be an interior boundary because there is no such thing as an interior boundary. He asserts that the word "exterior" is actually redundant in its use in Arizona legal authority. As we understand his argument, he believes that a roadway on the boundary of a defined area is by definition on its exterior. As authority, he cites *Flagstaff Vending Co. v. City of Flagstaff,* 118 Ariz. 556, 559, 578 P.2d 985, 988 (1978), which notes that "the exterior boundary of Flagstaff completely surrounds Northern Arizona University." We disagree that "exterior boundary" is synonymous with "boundary."

¶ 27 *Flagstaff Vending Co.* found the university to be within the exterior boundary of the city, but it is possible for property to be within the exterior boundary of a city yet not be a part of the city. This happens when the city does not annex an entire area, but only enough land to completely surround other lands. *See Republic Inv. Fund I v. Town of Surprise,* 166 Ariz. 143, 800 P.2d 1251 (1990) (annexation created an island of unincorporated land within the town's border); *Sanderson Lincoln Mercury, Inc. v. Ford Motor Co.,* 205 Ariz. 202, 208, ¶ 23, 68 P.3d 428, 434 (App.2003) (business located on county island within city). In such a situation there is a boundary between lands that are within the jurisdiction of the city and those that are not included within that jurisdiction that is entirely within the exterior boundary of the city. Although "interior boundary" may not be an artful term for such a dividing line, we conclude that an exterior boundary of an area of land is not necessarily the same as a boundary.

¶ 28 The facts of this case show how the ordinance operates in practice. The record does not explain why in 1955 the landowners

wanted an east-west alley behind the lots fronting on Northern Avenue, but the effect of their transfers was to create an additional roadway that did more than benefit only one lot or landowner. The alleys benefitted the subdivision as a whole. Indeed, if we were to look only to the interests of the owner of Lot 10 it is difficult to see why the land would have been transferred to the County. Lot 10 already had access to both a street (12th Place) and an alley (the West Alley). Knowing, however, that the Hartes also owned Lot 11, and apparently Lot 12, puts their interests in a different light. The South Alley ran behind both Lots 11 and 12, creating off-street access from the rear of both lots to 12th Street and 12th Place. By changing the interior street configuration of the Hood Homes Subdivision, the Hartes benefitted more than just Lot 10. They benefitted Lots 11 and 12, and by conveying the Triangle Alley to allow easier access to the west, they probably benefitted Lots 1 and 2 as well. The ordinance recognizes the broader beneficial use of roadways within a subdivision by distinguishing between exterior and interior roadways. Under these circumstances, it is reasonable that the South Alley be divided in the same manner as the West Alley, i.e., evenly between the abutting landowners.

¶ 29 Our holding that "other tract of land" does not include land within a subdivision makes it unnecessary to more precisely define "tract." This term is not defined in the City Code, and seems to have a fairly fluid general meaning. As discussed above, in the context of the ordinance it may be understood as contiguous land having a common owner or use. Applying this understanding to the facts of this case, it is not clear to us that the South Alley was the exterior boundary of a tract of land. It is undisputed that the Hartes owned both Lots 10 and 11. It appears from the deed transferring part of Lot 12 to the County that they also owned Lot 12. It is arguable that Lots 10, 11 and 12 constituted a single "tract" of land at the time the South Alley was cut through it, so the South Alley would not be the exterior boundary of that tract. Moreover, while the record does not show a complete chain of ownership after 1955, it does show that Bill Yu acquired Lot 10, Lot 12, and a portion of Lot 11 from the same grantor in a single transaction. Therefore, it is possible that until Speros acquired Lot 10 from Yu, Lots 10 and 12 were never separately owned. Because we conclude that subsection (c)(1) does not apply within a subdivision, this fact does not control our analysis, nor is there any need to remand the case for further factual development. These facts do, however, show some of the difficulties in simply defining "tract" as a "lot" within a subdivision for purposes of vesting title to abandoned roadways.

¶ 30 We conclude that when the ordinance refers to "a subdivision or other tract of land," it means that the two terms are mutually exclusive. "Other tract of land" is land that is not within a subdivision. This interpretation recognizes that a tract of land will generally have common ownership or use, just as a subdivision once had a subdivider who had the authority to divide and develop it. This interpretation also gives meaning to all the terms in the subsection, because "subdivision" will be applied when the land is a subdivision, while "other tract of land" will apply when it is not.

## CONCLUSION

¶ 31 For the foregoing reasons, we affirm the trial court's judgment. Each party requests attorneys' fees pursuant to A.R.S. § 12–1103(B). Speros also requests fees for work done in the trial court. A.R.S. § 12–1103(B) allows a court to award a party costs and attorneys' fees to a prevailing party if, prior to initiating its quiet title action, the party timely requested the opposing party to execute a quit-claim deed to the property at issue. A.R.S. § 12–1103(B). Speros is not the prevailing party, so we deny his claims. In the exercise of our discretion, we award Yu reasonable attorneys' fees and costs on appeal upon her compliance with Rule 21, Arizona Rules of Appellate Procedure.

¶ 32 We affirm the judgment of the trial court.

CONCURRING: PHILIP HALL, Presiding Judge, and JOHN C. GEMMILL, Judge.

# APPENDIX A

DEVELOPMENT.
SERVICES
DEPARTMENT
NORTH ↑

SCALE : NTS

APPLICANT : Sky King, Inc.
DATE : 5/10/99

APPLICATION NO. V990101A    QUARTER SEC. 25-30

PROPOSED ABANDONMENT

19485