**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

GILA RIVER INDIAN COMMUNITY,
a federally recognized Indian
Tribe; DELVIN JOHN TERRY;
CELESTINO RIOS; BRANDON RIOS;
DAMON RIOS; CAMERON RIOS,
                    *Plaintiffs*,

JOHN MCCOMISH, Arizona
Legislature, Majority Leader;
CHUCK GRAY, Arizona
Legislature, Senate Majority
Leader; STATE OF ARIZONA; KIRK
ADAMS, Arizona Legislature,
Speaker of the House,
          *Intervenor-Plaintiffs*,

          and

CITY OF GLENDALE; MICHAEL
SOCACIU; GARY HIRSCH,
          *Plaintiffs-Appellants*,

          v.

UNITED STATES OF AMERICA;
UNITED STATES DEPARTMENT OF
THE INTERIOR; KENNETH LEE
SALAZAR, in his official capacity
as United States Secretary of the

No. 11-15631

D.C. Nos.
2:10-cv-01993-DGC
2:10-cv-02017-DGC
2:10-cv-02138-DGC

Interior; LARRY ECHO HAWK, in his official capacity as the Assistant Secretary for Indian Affairs of the United States Department of the Interior,
*Defendants-Appellees*,

TOHONO O'ODHAM NATION,
*Intervenor-Defendant-Appellee.*

---

GILA RIVER INDIAN COMMUNITY, a federally recognized Indian Tribe; CITY OF GLENDALE; MICHAEL SOCACIU; DELVIN JOHN TERRY; CELESTINO RIOS; BRANDON RIOS; DAMON RIOS; CAMERON RIOS; GARY HIRSCH,
*Plaintiffs*,

JOHN MCCOMISH, Arizona Legislature, Majority Leader; CHUCK GRAY, Arizona Legislature, Senature Majority Leader; KIRK ADAMS, Arizona Legislature, Speaker of the House,
*Petitioners-Intervenors*,

and

STATE OF ARIZONA,
*Intervenor-Plaintiff-Appellant*,

No. 11-15633

D.C. No.
2:10-cv-01993-DGC

v.

UNITED STATES OF AMERICA;
UNITED STATES DEPARTMENT OF
THE INTERIOR; KENNETH LEE
SALAZAR, in his official capacity
as United States Secretary of the
Interior; LARRY ECHO HAWK, in
his official capacity as the
Assistant Secretary for Indian
Affairs of the United States
Department of the Interior,
   *Defendants-Appellees*,

TOHONO O'ODHAM NATION,
 *Intervenor-Defendant-Appellee*.

---

GILA RIVER INDIAN COMMUNITY,
a federally recognized Indian
Tribe,
   *Plaintiff-Appellant*,

  and

CITY OF GLENDALE; MICHAEL
SOCACIU; DELVIN JOHN TERRY;
CELESTINO RIOS; BRANDON RIOS;
DAMON RIOS; CAMERON RIOS,
GARY HIRSCH,
   *Plaintiffs*,

No. 11-15639

D.C. Nos.
2:10-cv-01993-DGC
2:10-cv-02017-DGC
2:10-cv-02138-DGC

JOHN MCCOMISH, Arizona
Legislature, Majority Leader;
CHUCK GRAY, Arizona
Legislature, Senature Majority
Leader; STATE OF ARIZONA, KIRK
ADAMS, Arizona Legislature,
Speaker of the House,
*Intervenor-Plaintiffs*,

v.

UNITED STATES OF AMERICA;
UNITED STATES DEPARTMENT OF
THE INTERIOR; KENNETH LEE
SALAZAR, in his official capacity
as United States Secretary of the
Interior; LARRY ECHO HAWK, in
his official capacity as the
Assistant Secretary for Indian
Affairs of the United States
Department of the Interior,
*Defendants-Appellees*,

TOHONO O'ODHAM NATION,
   *Intervenor-Defendant-Appellee.*

GILA RIVER INDIAN COMMUNITY,
a federally recognized Indian
Tribe; CITY OF GLENDALE;
MICHAEL SOCACIU; GARY
HIRSCH,
                        *Plaintiffs*,

JOHN MCCOMISH, Arizona
Legislature, Majority Leader;
CHUCK GRAY, Arizona
Legislature, Senature Majority
Leader; STATE OF ARIZONA, KIRK
ADAMS, Arizona Legislature,
Speaker of the House,
            *Intervenor-Plaintiffs*,

and

DELVIN JOHN TERRY; CELESTINO
RIOS; BRANDON RIOS; DAMON
RIOS; CAMERON RIOS,
            *Plaintiffs-Appellants*,

v.

UNITED STATES OF AMERICA;
UNITED STATES DEPARTMENT OF
THE INTERIOR; KENNETH LEE
SALAZAR, in his official capacity
as United States Secretary of the
Interior; LARRY ECHO HAWK, in
his official capacity as the
Assistant Secretary for Indian

No. 11-15641

D.C. Nos.
2:10-cv-01993-DGC
2:10-cv-02017-DGC
2:10-cv-02138-DGC

Affairs of the United States
Department of the Interior,
     *Defendants-Appellees*,

TOHONO O'ODHAM NATION,
    *Intervenor-Defendant-Appellee.*

---

GILA RIVER INDIAN COMMUNITY,
a federally recognized Indian
Tribe; CITY OF GLENDALE;
MICHAEL SOCACIU; DELVIN JOHN
TERRY; CELESTINO RIOS;
BRANDON RIOS; DAMON RIOS;
CAMERON RIOS; GARY HIRSCH,
               *Plaintiffs*,

STATE OF ARIZONA,
          *Intervenor-Plaintiff*,

            and

JOHN MCCOMISH, Arizona
Legislature, Majority Leader;
CHUCK GRAY, Arizona
Legislature, Senature Majority
Leader; KIRK ADAMS, Arizona
Legislature, Speaker of the
House; ANDY TOBIN, House
Majority Whip,
    *Intervenor-Plaintiff-Appellants*,

No. 11-15642

D.C. Nos.
2:10-cv-01993-DGC
2:10-cv-02017-DGC
2:10-cv-02138-DGC

AMENDED
OPINION

v.

UNITED STATES OF AMERICA;
UNITED STATES DEPARTMENT OF
THE INTERIOR; KENNETH LEE
SALAZAR, in his official capacity
as United States Secretary of the
Interior; LARRY ECHO HAWK, in
his official capacity as the
Assistant Secretary for Indian
Affairs of the United States
Department of the Interior,
            *Defendants-Appellees*,

TOHONO O'ODHAM NATION,
    *Intervenor-Defendant-Appellee.*

Appeal from the United States District Court
for the District of Arizona
David G. Campbell, District Judge, Presiding

Argued and Submitted
April 16, 2012—San Francisco, California

Filed May 20, 2013
Amended July 9, 2013

Before: M. Margaret McKeown, N. Randy Smith,
and Jacqueline H. Nguyen,[*] Circuit Judges.

Opinion by Judge McKeown;
Dissent by Judge N.R. Smith

**SUMMARY**[**]

**Indian Tribes**

The panel withdrew its prior opinion and published a superseding opinion affirming in part, and reversing and remanding in part, the district court's summary judgment in favor of federal defendants in an action by the City of Glendale seeking to set aside the United States Department of Interior's decision to accept in trust, for the benefit of the Tohono O'odham Nation, a 54-acre parcel of land known as Parcel 2 on which the Nation hoped to build a resort and casino.

The panel held the Gila Bend Indian Reservation Lands Replacement Act, read as a whole, was unambiguous and that § 6(c) of the Act created a cap only on land held in trust for the Nation, not on total land acquisition by the tribe under the Act. The panel held that § 6(d) of Act was ambiguous as to

[*] The Honorable Jacqueline H. Nguyen was a District Judge for the U.S. District Court for the Central District of California sitting by designation at the time of argument and submission.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

whether Parcel 2, located on a county island fully surrounded by city land, was *within* the City of Glendale's corporate limits. The panel held further that the Secretary of the Interior was mistaken in concluding that the term has a plain meaning, and remanded for the agency to consider the question afresh in light of the ambiguity the panel saw. Finally, the panel held that passage of the Act was within congressional power under the Indian Commerce Clause and was not trumped by the Tenth Amendment

Judge N.R. Smith dissented. Judge Smith would hold that the statutory text of the Act clearly prohibits the Secretary's ability to take land, that is "within the corporate limits" of a city, into trust when the city's limits wholly surround that land, such as the parcel at issue in this case. Judge Smith would also hold that a remand to the agency is improper because the case should be resolved against the agency under step one of the *Chevron* analysis.

## COUNSEL

Patricia A. Millett (argued), Akin Gump Strauss Hauer & Feld, Washington, D.C. for Plaintiff-Appellant Gila River Indian Community; Catherine E. Stetson (argued), Hogan Lovells, Washington, D.C. for Plaintiff-Appellant City of Glendale; David R. Cole (argued), Dep. State Atty. Gen., Phoenix, Arizona, for Plaintiff-Intervenor-Appellant State of Arizona.

Aaron P. Avila (argued), Dep't of Just., Washington, D.C., for Defendants-Appellees the United States of America, et. al.; Seth P. Waxman (argued), Wilmer Cutler Pickering Hale and Dorr, Washington, D.C., for Defendant-Intervenor-Appellee the Tohono O'odham Nation.

**OPINION**

McKEOWN, Circuit Judge:

This case illustrates the nuances of our federalist system of government, pitting Indian tribe against Indian tribe, and State and local governments against the federal government and an Indian tribe. The City of Glendale and various other parties ("Glendale") seek to set aside the Department of the Interior's decision to accept in trust, for the benefit of the Tohono O'odham Nation ("the Nation"), a 54-acre parcel of land known as Parcel 2. The Nation hopes to build a destination resort and casino on Parcel 2, which is unincorporated county land, entirely surrounded by the City of Glendale. To say this plan has been controversial is an understatement. But the strong feelings and emotional drama of the casino fight do not dictate the outcome here. This appeal relates only to the status of the land as trust land and does not involve the particulars of Indian gaming, which are the subject of separate proceedings and pending legislation. The district court granted summary judgment for the government after concluding that the Secretary of the Interior reasonably applied the Gila Bend Indian Reservation Lands Replacement Act ("Gila Bend Act"), and that the Act did not violate the Indian Commerce Clause or the Tenth Amendment. We affirm in part, reverse in part, and remand.

## BACKGROUND

### I.  THE GILA BEND ACT

The Nation, earlier known as the Papago Tribe of Arizona, is a federally recognized Indian Tribe with over 28,000 members.  The Gila Bend Reservation was established as early as 1882.  Today, the reservation includes non-contiguous land located near Tucson, Phoenix, and the town of Gila Bend, as well as points in between.  In 1960, the federal government completed construction of the Painted Rock Dam ten miles downstream from the Gila Bend Reservation.  During the late 1970s and early 1980s, the reservation was plagued by flooding from the dam, which eventually destroyed a large farm developed by the Nation, leaving the land unsuitable for economic use.

Congress responded to the flooding and the Nation's petition for a new reservation with the Gila Bend Act.  The purpose of the Act was to "facilitate replacement of reservation lands with lands suitable for sustained economic use which is not principally farming . . . and promote the economic self-sufficiency of" the Nation.  Pub. L. No. 99-503, 100 Stat. 1798, § 2(4).  Under § 4 of the Act, the Nation transferred 9,880 acres of reservation land to the United States in return for $30 million and the right to replace the lost reservation acre-for-acre.  *Id.* at §§ 4(a), 6(c).  Subject to the requirements and limitations of the Act, the Secretary of the Interior is required to take up to 9,880 acres of land into trust for the benefit of the Nation, effectively making the land part of the Nation's reservation.  *Id.* at § 6(d).

The Act permits the Nation to use the funds for various purposes, including the purchase of land, and economic and

community development. § 6(a).[1]  Section 6(c) imposes an acreage limit.[2]  Section 6(d) establishes that trust land refers to land under subsection (c), and that such land cannot be taken into trust as reservation land if it is (i) outside certain counties, or (ii) "within the corporate limits of any city or town."[3]

Over the decades after passage of the Act, the Nation acquired land in Arizona but only one parcel has been taken into trust.  Then, in 2003, the Nation purchased the disputed land as part of a 135-acre acquisition.  The land is a "county island," surrounded entirely by the City of Glendale.  A county island is unincorporated land surrounded entirely by lands incorporated by the municipality.  *See Town of Gilbert v. Maricopa Cnty.*, 141 P.3d 416, 418 n.1 (Ariz. Ct. App. 2006) (describing county island).

---

[1] "The Tribe shall invest sums received under section 4 in interest bearing deposits and securities until expended. The . . . [Nation] may spend the principal and the interest and dividends accruing on such sums . . . for land and water rights acquisition, economic and community development, and relocation costs."  § 6(a).

[2] "The Tribe is authorized to acquire by purchase private lands in an amount not to exceed, in the aggregate, nine thousand eight hundred and eighty acres." § 6(c).

[3] "The Secretary, at the request of the Tribe, shall hold in trust for the benefit of the Tribe any land which the Tribe acquires pursuant to subsection (c) which meets the requirements of this subsection. Any land which the Secretary holds in trust shall be deemed to be a Federal Indian Reservation for all purposes. Land does not meet the requirements of this subsection if it is outside the counties of Maricopa, Pinal, and Pima, Arizona, or within the corporate limits of any city or town."  § 6(d).

In 2009, the Nation announced plans to use the land for gaming purposes and filed an application with the Department of the Interior to have the land held in trust under the Gila Bend Act.  In response, the City of Glendale sought to annex a portion of the 135 acres.  The Nation filed suit in state court challenging the annexation effort.[4]  Due to ongoing state litigation, without relinquishing its claim to the full 135 acres, the Nation requested that the Department of the Interior accept into trust only a 54-acre portion of the land not at issue in state court:  Parcel 2, the subject of this appeal.[5]

## II.  PRIOR PROCEEDINGS AND DECISIONS

Although the Department of the Interior treated the Nation's trust application as an ex parte filing, in March 2009, both the City of Glendale and the Gila River Indian

---

[4] The Nation ultimately prevailed on appeal.  *See Tohono O'odham Nation v. City of Glendale*, 253 P.3d 632 (Ariz. Ct. App. 2011), *petition for review denied* Oct. 25, 2011.

[5] The dissent recounts various facts at length to provide, in its view, "the rest of the story."  In effect, the dissent along with the parties opposing the trust designation, infuse the appeal with the Nation's economic motives and plans for Indian gaming on the trust land.  But those issues are not on appeal.  We do not and are not called upon to express an opinion as to the availability of the trust land for use as a casino.  That question is tied up in other litigation and the legislation that recently passed the House of Representatives.  *See* Gila Bend Indian Reservation Lands Replacement Clarification Act.  H.R. REP. No. 112-440 (2012).  This issue does not bear on our interpretation of the Gila Bend Act.

Community[6] filed lengthy submissions opposing the trust application. Their submissions argued that Parcel 2 fell "within the corporate limits" of the City of Glendale and was therefore ineligible for trust status under § 6(d) of the Gila Bend Act.

The Secretary of the Interior concluded that the requirements of the Gila Bend Act were met. Specifically, Parcel 2 is wholly within Maricopa County and is outside the City of Glendale's corporate limits. In considering whether the land qualified for trust status under § 6(d), the Secretary explained that "[t]he Western Regional Director of the BIA [Bureau of Indian Affairs], acting under authority of the Secretary, issued a waiver under Section 6(d) . . . that allowed the Nation to purchase up to five (5) separate areas of replacement land, rather than three, and further waived the requirement that one of these areas be contiguous to the San Lucy reservation." In any event, since Parcel 2 is only the second replacement land area to be held in trust under the Act, those waivers do not directly implicate the analysis here. Thus, in accord with the mandate of the Act, the Secretary determined that Parcel 2 must be held in trust for the Nation.

In upholding the Secretary of the Interior's decision, in a careful, comprehensive opinion, the district court concluded that Glendale had waived its argument regarding a total acreage cap under § 6(c) of the Act, because it failed to raise

---

[6] The Gila River Indian Community is a separate tribe whose gaming interests are implicated by the Nation's plans to develop a casino on Parcel 2.

the issue in the administrative proceeding.[7]  The district court then deemed the statutory language "within the corporate limits" in § 6(d) to be ambiguous as to county islands like Parcel 2, and concluded that Arizona law was inconclusive. Applying *Chevron*, the court deferred to the agency's interpretation of the statute and affirmed the trust decision as "based on a permissible construction of the statute."  *See Chevron, U.S.A., Inc. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837, 843 (1984).  Finally, the district court rejected the constitutional arguments under the Tenth Amendment and the Indian Commerce Clause.

"We review the grant of summary judgment de novo, thus reviewing directly the agency's action under the Administrative Procedure Act's (APA) arbitrary and capricious standard."  *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1065 (9th Cir. 2004).

## ANALYSIS

We first consider two questions of statutory interpretation:  Whether the Gila Bend Act's trust land acreage limit is implicated, and whether Parcel 2 is "within" the corporate limits of the City of Glendale.  We evaluate an agency's interpretation of a statute it is entrusted to administer by first determining "whether Congress has directly spoken to the precise question at issue."  *Chevron*, 467 U.S. at 842.  If Congress has directly spoken, "the agency (and the court) must give effect to Congress's clearly

---

[7] We note that, according to the Secretary, the normal "notice and comment provisions of 25 C.F.R. §§ 151.10 and 151.11(d), requiring that the BIA notify state and local governments of the land-into-trust application, are not applicable" to this transaction.

expressed intent." *Adams v. U.S. Forest Serv.*, 671 F.3d 1138, 1143 (9th Cir. 2012). If, on the other hand, a statute is ambiguous, we defer to the agency's interpretation where the "interpretation was 'a reasonable policy choice for the agency to make.'" *Id.* (quoting *Chevron*, 467 U.S. at 845).

The remaining issues pertain to the limits of congressional power under the Indian Commerce Clause and the Tenth Amendment.[8]

## I.   THE ACREAGE LIMIT IN SECTION 6(C)

Section 6(c) of the Gila Bend Act provides that the Nation "is authorized to acquire by purchase private lands in an amount not to exceed, in the aggregate, 9,880 acres." In turn, the following subsection, 6(d), describes trust land as being land acquired "pursuant to subsection (c)." Before the district court, Glendale argued for the first time that § 6(c) precludes the Nation from acquiring more than 9,880 acres with money from the Act and that the Nation already had exceeded that acreage cap before acquiring Parcel 2. The Nation responds that the cap only applies to land held in trust via § 6(d), and not to land remaining in fee status.

While the Secretary of the Interior did not squarely consider the acreage cap because the issue was never framed as a barrier to taking Parcel 2 in trust, reading the Secretary's decision in context is telling. In determining whether the § 6(d) trustee requirements were met, the Secretary read the

---

[8] The Gila River Indian Community and the Terry and Rios appellants appeal as to all issues except the Indian Commerce Clause and the Tenth Amendment. The City of Glendale and the various Arizona appellants (collectively "Arizona appellants") appeal as to all of the issues.

statute as creating a cap on land that could be held in trust under the Gila Bend Act, not as a cap on the total acreage that the Nation could acquire.  The Secretary explained the basis of this reading, noting that "[t]he first, and so far only, land acquired in trust for the Nation" was 3,200.53 acres acquired in September 2004.  The decision goes on to state that there was another trust application for 3,759.52 acres but that the land was still held in fee.  Therefore, the Secretary did not consider land held in fee as relevant to the analysis of the acquisition limitations under the Gila Bend Act.  The decision explicitly counts only the fee-to-trust lands, not lands remaining in fee status.

During agency proceedings, the Gila River Indian Community, one of the parties now raising the acreage cap argument, noted, in contrast to its current position, that "[s]ection 6(c) limits the number of acres that may be placed into trust to no more than 9,880 acres."  Appellants, including the Gila River Indian Community, now take the opposite position and argue that because the agency proceedings were non-adversarial, the issue should be considered on the merits. The Nation and the government maintain that the acreage cap argument was waived.  The ultimate question is one of statutory construction.

Assuming, without deciding, that the argument was not waived, we hold that the statute read as a whole is unambiguous and that § 6(c) creates a cap only on land held in trust for the Nation, not on total land acquisition by the tribe under the Act.

Our goal is to understand the statute "as a symmetrical and coherent regulatory scheme" and to "fit, if possible, all parts into a harmonious whole." *FDA v. Brown & Williamson*

*Tobacco Corp.*, 529 U.S. 120, 133 (2000) (citations omitted). Section 6(a) authorizes the Nation to use funds received under the Gila Bend Act "for land and water rights acquisition, economic and community development, and relocation costs." This authorization is broader than land acquisition and does not address trust acreage to replace the Nation's lost reservation land.

Apart from the general provisions of § 6(a), three provisions of the Act concern the divestment and replacement of reservation land. Section 4 concerns the original 9,880-acre reservation, and specifies the conditions under which the Nation would forfeit its "right, title, and interest . . . in nine thousand eight hundred and eighty acres of [reservation] land." Subsections 6(c) and 6(d) provide for the replacement of this precise number of acres of reservation land. Section 6(d) explains the mechanism for restoring reservation land, which requires placing land in trust, and limits the location of reservation land. More specifically, § 6(d) provides:

> The Secretary, at the request of the Tribe, shall hold in trust for the benefit of the Tribe any land which the Tribe acquires pursuant to subsection (c) which meets the requirements of this subsection. Any land which the Secretary holds in trust shall be deemed to be a Federal Indian Reservation for all purposes.

Section 6(c), in turn, limits the size of newly acquired trust land to that of the previous reservation: 9,880 acres. Thus, § 6(c) imposes a limit upon the size of land placed in trust for reservation purposes, under § 6(d), rather than upon total land

acquisition under § 6(a).   Subsection 6(c) and 6(d) are internally cross-referenced and must be read together.

Aside from its inapplicability to non-reservation land, treating § 6(c) as a limit on land acquired under § 6(a) is problematic for other reasons.  Congress crafted the Gila Bend Act to allow the Nation substantial autonomy in the use of funds and the acquisition of new reservation land.  Because Congress did not expect the Nation to spend the Gila Bend Act funds immediately or all at once, Congress provided that the funds be invested in "interest bearing deposits and securities until expended."    § 6(a).    This requirement underscores that Congress did not intend for the tribe to spend a fixed dollar amount, or to spend a specific amount on land, or to acquire the land at any particular time.  Rather, the Nation was to have broad discretion in the use of Gila Bend Act funds, and the yield on those funds.  The ability to buy land without regard to the cap on trust acreage and then designate the parcels for conversion to trust is well within the "great flexibility" Congress authorized for the Nation.  *See* H.R. Rep. No. 99-851, at 10 (1986) (envisioning the Nation to "have great flexibility in determining the use of funds provided under the Act.").

Of course, the Nation does not need statutory authorization to acquire and hold land in fee simple.  The Nation has the right to buy and sell land just like other persons or entities.  *See Cohen's Handbook of Federal Indian Law* § 15.04 (describing various forms of tribal land acquisition, including the purchase of fee simple title).  Glendale's reading would mean that the Gila Bend Act purported to curtail the Nation's independent right to buy and sell land, an outcome we do not endorse and one that is inconsistent with decades of Indian law.

Further, § 6(b) relieves the Secretary of any audit or oversight responsibility for expenditure of funds under § 6(a): "The Secretary [of the Interior] shall not be responsible for the review, approval, or audit of the use and expenditure" of the replacement land funds. § 6(b). If § 6(a) were cabined by § 6(c), the Secretary would necessarily undertake a monitoring function as to expenditure of money for trust lands, a responsibility specifically disclaimed by the Act.

Finally, as a practical matter, even Glendale's interpretation would permit the Secretary to accept Parcel 2 in trust. This argument boils down to the view that the first 9,880 acres acquired must go into trust. Nothing in the Act specifies that the lands must go into trust in a chronological order pegged to the time of acquisition. There is no FIFO (first in, first out) principle incorporated in the Act. The Act allows the Nation to replace, acre-for-acre, the 9,880 acres of reservation land it relinquished to federal control under § 4(a). To date, the Secretary of the Interior has taken just one parcel into trust for the Nation, an approximately 3,200-acre parcel known as San Lucy Farms. Acquisition in trust of the 54 acres in Parcel 2 would be the Nation's second trust acquisition and, after acquisition, the Nation would remain well below the 9,880-acre cap on trust land. That the Nation may have purchased other land is irrelevant to the clear limitation that only 9,880 acres may be held in trust.

## II. THE CORPORATE LIMITS RESTRICTION IN SECTION 6(D)

Section 6(d) of the Gila Bend Act prohibits the Secretary of the Interior from taking land into trust "if it is outside the counties of Maricopa, Pinal, and Pima, Arizona, or *within the corporate limits of any city or town*." (emphasis added). It

is undisputed that Parcel 2 is in Maricopa county; the issue is whether Parcel 2, located on a county island fully surrounded by city land, is *within* the City of Glendale's corporate limits.

The Secretary, invoking plain meaning, interpreted the phrase "within the corporate limits" as "show[ing] a clear intent to make a given piece of property eligible under the Act if it is on the unincorporated side of a city's boundary line," and concluded Parcel 2 therefore could be taken into trust. Similarly, the government and the Nation argue for a jurisdictional meaning: Any land not subject to a city's corporate jurisdiction is not "within" the city.[9] The Arizona appellants contend the phrase should have a geographical meaning: Any land entirely surrounded by a city's corporate limits is "within" the city. Who knew that such a straightforward sounding phrase, "within the corporate limits," could generate such competing views.

As explained below, we conclude the statute is ambiguous. The Secretary's decision reflects a failure to grapple with the ambiguity and prompts us to remand for the Secretary to bring his expertise to bear to interpret the provision anew. *See Negusie v. Holder*, 555 U.S. 511, 523 (2009) ("[I]f an agency erroneously contends that Congress' intent has been clearly expressed and has rested on that ground, we remand to require the agency to consider the question afresh in light of the ambiguity we see.") (internal quotation marks omitted).

---

[9] The dissent's suggestion that the government took a differing view in prior litigation is not borne out by the record. In totally unrelated litigation, the government made passing reference to geographical restrictions on trust land. But, in doing so, the brief did not consider the distinction under § 6(d) nor was this section at issue in the litigation.

The Department of the Interior's treatment of the provision is telling. The Department's Office of the Solicitor prepared a memorandum for the Secretary on the meaning of "corporate limits" and concluded the term was ambiguous. The Field Solicitor, considering submissions from both the Nation and the City, explained: "A close review of the statutes and case law of the State of Arizona reveals that this question has no clear or dispositive answer, and that there is ambiguity about it, even to the point of one of the Justices of the Arizona Supreme Court admitting as much." Although the Field Solicitor was inclined to accord the term a jurisdictional meaning in reliance on *Speros v. Yu*, 83 P.3d 1094 (Ariz. Ct. App. 2004), he emphasized that such a position was "reached with some degree of caution, since the concepts of 'exterior boundaries' and 'corporate limits' are neither expressly defined nor used with any real consistency under Arizona law." Ultimately, the Field Solicitor determined that to resolve the inconsistency he was "obliged to invoke the rule regarding canons of construction regarding Federal Indian law and Indian jurisprudence," which counsels that ambiguous statutes are to be construed in favor of Indians. *See Cnty. of Yakima v. Confederated Tribes and Bands of Yakima Nation*, 502 U.S. 251, 269 (1992). Applying that canon, the Field Solicitor interpreted the term to have a jurisdictional meaning.

In the trust decision, the Secretary referenced but parted ways with the Field Solicitor's report and concluded that the term "corporate limits" was not ambiguous. The Secretary determined the term had the plain meaning of indicating the jurisdictional status of fee land: "The use of 'corporate limits' shows a *clear intent* to make a given piece of property eligible under the [Gila Bend] Act if it is on the unincorporated side of the city's boundary line." (emphasis

added).  The Secretary reasoned that, had Congress intended to exclude county islands from possible trust acquisition, it could have done so by using language such as "exterior boundary," "within one mile of any city" or "city limits." *See, e.g.*, 16 U.S.C. § 485 (Secretary of Agriculture may accept "title to any lands within the exterior boundaries of the national forests"); 25 U.S.C. § 465 (certain funds may not be "used to acquire additional land outside of the exterior boundaries of Navajo Indian Reservation").  In a footnote of the trust decision, the Secretary added, in the alternative, that "[e]ven if Congress's intent was less clear. . . we interpret the term not to support a conclusion that Parcel 2 is ineligible under the Act, with or without consideration of the [Indian] canon."

We hold that the Secretary was mistaken in concluding that the term has a plain meaning.[10]  Giving the key phrase "within the corporate limits" its plain, natural, and common meaning does not resolve the ambiguity.  *United States v. Romo-Romo*, 246 F.3d 1272, 1275 (9th Cir. 2001) ("[W]e should usually give words their plain, natural, ordinary and commonly understood meanings.").  Here, either reading of the term as used in the statute is plausible.  Further, we agree with the Field Solicitor's conclusion that Arizona law does not conclusively solve the dilemma.

The history of Arizona's treatment of county islands underscores the lack of uniformity of interpretation and uncertainty that carries over to the Gila Bend Act's use of the

---

[10] Curiously, the dissent takes the view that the text of § 6(d) has a plain meaning but then surprisingly comes to an interpretation at odds with the Secretary.  Even the division within our panel underscores the lack of clarity in the statute.

"within the corporate limits" designation.  In past ordinances, the City of Glendale has characterized county islands as lying outside its corporate limits and requiring annexation to be included within the City's limits.  For example, when the City of Glendale incorporated a strip of land that surrounds Parcel 2 and other unincorporated territory, the annexation ordinance provided that "the present corporate limits [are] extended and increased to include" only the strip of land precisely described with metes and bounds.  City of Glendale, AZ, Ordinance 986 New Series, (July 26, 1977).  Similarly, numerous City of Glendale annexation ordinances address land "located within an existing county island" and confirm that as a result of the annexation, the newly annexed county island will "be included within the corporate limits of the City of Glendale." *See, e.g.*, City of Glendale, AZ, Ordinance 2693 New Series, (Sept. 23, 2009); City of Glendale, AZ, Ordinance 2674 New Series, (Mar. 18, 2009); City of Glendale, AZ, Ordinance 2668 New Series, (Mar. 11, 2009). Some Arizona statutes also refer to county islands as falling outside corporate limits. *See, e.g.*, Ariz. Rev. Stat. Ann. § 9-500.23 (authorizing a city to "provide fire and emergency medical services outside its corporate limits to a county island").  However, Arizona statutes do not explicitly define the term and Arizona courts have used "corporate limits" and "exterior boundaries" interchangeably. *See, e.g.*, *Flagstaff Vending Co. v. City of Flagstaff*, 578 P.2d 985, 987 (Ariz. 1978) (holding that a state-owned university campus was "within" city limits for purposes of local tax ordinances).

Having resolved that the statute is ambiguous, the question is how to treat the Secretary's decision under *Chevron*.  We conclude that the Secretary's interpretation warrants no deference because it rests on a mistaken conclusion that the language has a plain meaning.

Were the statute clear, we would simply "stop the music at step one," as we did with § 6(c), *supra*, in order to "give effect to [Congress's] unambiguously expressed intent." *Northpoint Tech., Ltd. v. FCC*, 412 F.3d 145, 151 (D.C. Cir. 2005) (internal quotation marks omitted). Here, we must move to step two because Congress's intent is not clear. At this stage, normally we would defer as a matter of course to the agency's expertise and discretion in interpreting the statute. However, because the agency misapprehended the clarity of the statute, such deference is not in order. "[D]eference to an agency's interpretation of a statute is not appropriate when the agency wrongly 'believes that interpretation is compelled by Congress.'" *PDK Labs. Inc. v. DEA*, 362 F.3d 786, 798 (D.C. Cir. 2004) (quoting *Arizona v. Thompson*, 281 F.3d 248, 254 (D.C. Cir. 2002)).

The principle that *Chevron* deference does not apply where an agency mistakenly determines that its interpretation is mandated by plain meaning, or some other binding rule, is best illustrated by the Supreme Court's decision in *Negusie*. There, the Court declined to uphold the BIA's interpretation of an ambiguous provision of the Immigration and Nationality Act where the BIA mistakenly thought itself bound by Supreme Court precedent construing similar language in a different statute. *Negusie*, 555 U.S. at 518–19. Although the Court explained that the chosen interpretation might ultimately be reasonable, it declined to apply *Chevron* deference and remanded because the agency "deemed its interpretation to be mandated by [precedent], and that error prevented it from a *full consideration* of the statutory

question here presented." *Id.* at 521 (emphasis added);[11] *see also Delgado v. Holder*, 648 F.3d 1095, 1103 & n.12 (9th Cir. 2011) (en banc) (upholding BIA interpretation of ambiguous statute despite its reliance on plain text because the BIA's decision "did not rely on plain text alone" but also "emphasized that its interpretation is supported by the history and background" of the statute) (internal quotation marks omitted).

The present case has a twist that bears further consideration. Unlike in *Negusie*, the agency here did not rest entirely on the purportedly clear congressional intent, but added that it would reach the same conclusion "[e]ven if Congress's intent was less clear." This one-sentence caveat in a footnote is not entitled to *Chevron* deference, because the Secretary did not provide any explanation for this decision. In short, the passing footnote reflects "that the [Department of the Interior] has not yet exercised its *Chevron* discretion to interpret the statute in question" and thus "the proper course . . . is to remand to the agency for additional investigation or explanation." *Negusie*, 555 U.S. at 523 (internal question marks omitted).

The essence of *Chevron* deference at step two is to give meaning to the "delegation[] of authority to the agency to fill the statutory gap in reasonable fashion" through resolution of "difficult policy choices that agencies are better equipped to

---

[11] The Nation and the government view *Negusie* as inapposite because the Secretary here only believed himself bound by plain meaning rather than by precedent. This is a distinction without a difference. If the agency fails to bring its expertise to bear because it believes itself constrained for whatever reason from fully considering policy and practical considerations, the rationale for *Chevron*—agency expertise—is absent.

make than courts." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005). Without an explanation of the agency's reasons, it is impossible to know whether the agency employed its expertise or "simply pick[ed] a permissible interpretation out of a hat." *Vill. of Barrington v. Surface Transp. Bd.*, 636 F.3d 650, 660 (D.C. Cir. 2011) (holding that an agency warrants deference at *Chevron* step two "only if the agency has offered a *reasoned explanation* for why it chose that interpretation" judged according to "only the rationales the [agency] actually offered in its decision") (emphasis added); *see also Local Union 1261, United Mine Workers of Am. v. FMSHRC*, 917 F.2d 42, 43 (D.C. Cir.1990) (upholding agency's interpretation at *Chevron* step two even where the court disagreed with the agency's conclusion that the meaning of the statute was "plain" because the court concluded that the agency's decision "adequately stated the *practical and policy considerations* ultimately motivating its interpretation") (emphasis added).

The Secretary's discussion focuses on why the statutory text is clear and does not articulate any other factors counseling in favor of adopting the alternative position dropped into the footnote. The government argues that the Field Solicitor's report suffices to show that the Secretary grappled with the ambiguity of the statute. But the Secretary's decision merely referenced the Field Solicitor's determination that (some) Arizona law supports the conclusion that Parcel 2 is not within the corporate limits in support of the proposition that the statutory text was plain. The Secretary's decision goes out of its way to disclaim the ambiguity that the Field Solicitor highlighted, asserting repeatedly that the meaning is "plain" and that the language shows a "clear intent" to adopt a jurisdictional meaning. The

Secretary declined to consider the impact of the Indian canon—even though the Field Solicitor concluded application of the canon was necessary because Arizona law was too unsettled on the issue to yield a straightforward answer—and mentioned no policy or practical concerns.

The Supreme Court has explained that, although the "scope of review under the arbitrary and capricious standard is narrow," "the agency must . . . articulate a satisfactory explanation for its action." *Motor Veh. Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks and citation omitted). In this situation, deferring to the Secretary's unexplained caveat would permit the agency to sidestep its duty to bring its expertise to bear on the "difficult policy choices" it is tasked with making. *Negusie*, 555 U.S. at 523.

Because the Secretary relied on the text alone, we "remand to require the agency to consider the question afresh in light of the ambiguity we see." *Delgado*, 648 F.3d at 1103 n.12 (quoting *Negusie*, 555 U.S. at 523); *see also PDK Labs., Inc.*, 362 F.3d at 797–98 (holding that where there is ambiguity in the statutory text "it is incumbent upon the agency not to rest simply on its parsing of the statutory language. It must bring its experience and expertise to bear in light of competing interests at stake.") (footnote and citation omitted).[12]

---

[12] Aside from the issue of *Chevron* deference, the Nation argues that the Department of the Interior's trust decision is compelled by the Indian canon's requirement that when there is doubt as to the proper interpretation of an ambiguous provision in a federal statute enacted for the benefit of an Indian tribe, "the doubt [will] benefit the Tribe."

We are puzzled by the dissent's invocation of the clear statement or "federalism" canon. The clear statement rule, which is a canon of statutory construction, not a rule of constitutional law, applies where courts "confront[] a statute susceptible of two plausible interpretations, one of which . . . alter[s] the existing balance of federal and state powers." *Salinas v. United States*, 522 U.S. 52, 59 (1997); *see also Hilton v. South Carolina Pub. Rys. Comm'n*, 502 U.S. 197, 205–06 (1991) (distinguishing between a rule of constitutional law and a rule of statutory construction and using the plain statement rule as an example of a rule of statutory construction). The rule counsels that "absent a clear indication of Congress' intent to change the balance, the proper course [is] to adopt a construction which maintains the existing balance." *Salinas*, 522 U.S. at 59.

---

(quoting *Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 729 (9th Cir. 2003)). The Gila River Indian Community counters that the canon is inapplicable when there are competing tribal interests.

If by application of canons, or other "traditional tools of statutory construction," we could "ascertain[] that Congress had an intention on the precise question at issue," we would resolve the ambiguity at step one. *Chevron*, 467 U.S. at 843 n.9. However, the application of the Indian canon in these circumstances is unsettled. We therefore leave it to the Secretary to consider application of the Indian canon, and other relevant canons of statutory construction, in the first instance on remand. "The canons of construction applicable in Indian law are rooted in the unique trust relationship between the United States and the Indians." *Oneida County v. Oneida Indian Nation*, 470 U.S. 226, 247 (1985). The Secretary is best positioned to take stock initially of whether and how to weigh the competing interests. At this stage, the job of considering the statutory ambiguity in light of the conflicting interests "is not a task we ought to undertake on the agency's behalf." *Dep't of Treasury, IRS v. Fed. Labor Relations Auth.*, 494 U.S. 922, 933 (1990).

To begin, in the nine briefs filed with the court, it is no surprise that not a single brief referenced this argument.[13]  It is also telling that no party argued that the Secretary's construction of § 6(d), in particular, raised serious constitutional problems or implicated state sovereignty.  The Arizona appellants' effort at oral argument to reframe the rule to one of constitutional avoidance is unavailing because § 6(d) does not implicate constitutional sovereignty concerns.  Not only is this recharacterization of the claim an eleventh hour effort to change gears, but this canon of construction does not bear on our interpretation of the Gila Bend Act.

Neither the dissent nor the Arizona appellants have articulated a state sovereignty or constitutional interest vis-a-vis § 6(d).  Whatever our interpretation of the phrase "within the corporate limits of any city or town," it does not raise a question of federal encroachment on state power.  In short, the Gila Bend Act does not implicate an "existing balance of federal and state powers."  In *Gregory v. Ashcroft*, 501 U.S. 452 (1991), the Court does not indicate that the clear statement rule applies to any and all regulation of state governmental functions.    Justice White, in his partial concurrence, partial dissent in *Gregory* raises this issue explicitly: "The majority's approach is also unsound because it will serve only to confuse the law.  First, the majority fails to explain the scope of its rule. . . . Second, the majority does not explain its requirement that Congress' intent to regulate a particular state activity be 'plain to anyone reading [the federal statute].'" *Id.* at 478.  Virtually any federal legislation could be construed to have at least minor, derivative implications for traditional state functions.  For example,

---

[13] In an order from the panel after briefing and just before argument, the parties were asked to discuss the clear statement rule at oral argument.

does federal legislation appropriating funds for building and maintaining interstate highways require a plain statement of congressional intent to interfere with the traditional state functions of zoning and land use that the dissent flags in this case?  The plain statement rule should not be applied in a way that makes it into a useless tautology.

To the extent one is searching for a clear statement, Congress was clear:  The Nation is entitled to swap out 9,880 acres of trust land ceded to the federal government for land of equivalent total acreage.  This swap does not implicate state interests nor can the Arizona appellants seriously argue that state sovereign interests restrict the Secretary from establishing a reservation on trust land.[14]   As we know, "[s]tate sovereignty does not end at a reservation's border." *Nevada v. Hicks*, 533 U.S. 353, 361 (2001); *see also Surplus Trading Co. v. Cook*, 281 U.S. 647, 651 (1930) (citing Indian reservations as examples of federally managed land within state territory).

Even under the dissent's reading of the statute, nothing would prevent the Nation from acquiring land in trust immediately adjacent to a city's outermost boundary or even land that was almost, but not entirely encircled by corporate land.   This circumstance is not one in which "an administrative interpretation of a statute invokes the outer limits of Congress' power."  *Solid Waste Agency of N. Cook*

---

[14] To the extent the Arizona appellants argue that the Gila Bend Act impermissibly interferes with the state's interest in maintaining its taxable land base, the text of the Act provides a definitive answer:  "With respect to any private land acquired by the Tribe under section 6 and held in trust by the Secretary, the Secretary shall make payments to the State of Arizona and its political subdivisions in lieu of real property taxes." § 7(a).

*County v. U.S. Army Corps of Engineers*, 531 U.S. 159, 172 (2001). Neither plausible construction of the statute "raise[s] serious constitutional problems" that counsel invocation of the clear statement rule. *Id.* The dissent's real concern about a casino abutting the City of Glendale is revealed in its effort to transform statutory interpretation of a federal trust land provision into a blocking effort by the city. At this stage, no one knows whether a casino will be approved. The Nation faces regulatory and court battles that are beyond the scope of this appeal. To convert this issue from one of *Chevron* deference to a sovereignty battle over regulation of Indian gaming distorts the clear statement rule.

Although we disagree with the dissent's position that the clear statement rule is dispositive here, the agency is free on remand to consider the rule, along with the Indian canon and other canons of statutory construction, to assist it in dispatching its duty to bring its policy and practical expertise to bear in interpreting § 6(d). Because we do not consider a jurisdictional interpretation of the provision to be foreclosed, "the agency has the option of adhering to its decision" on remand. *Negusie*, 555 U.S. at 525 (Scalia, J., concurring).

## III.    THE INDIAN COMMERCE CLAUSE AND THE TENTH AMENDMENT

The final issue is the claim that the Gila Bend Act exceeds Congress's power under the Indian Commerce Clause and violates the Tenth Amendment. In rejecting this argument, the district court noted that "counsel for Glendale agreed during oral argument [that] Plaintiffs ask the Court to break new ground on this issue—to depart from every court decision that has previously addressed it." *See, e.g.*, *Carcieri v. Kempthorne*, 497 F.3d 15, 39–40 (1st Cir. 2007) (en banc),

*rev'd on other grounds*, 555 U.S. 379 (2009) (emphasizing that powers expressly delegated to Congress do not implicate the Tenth Amendment, and that "[b]ecause Congress has plenary authority to regulate Indian affairs, [the challenged act] does not offend the Tenth Amendment."). On appeal, the Arizona appellants offer no such acknowledgment. The gist of their argument is that the Gila Bend Act infringes on Arizona's sovereignty. Their effort to invoke *Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996), which considered the Eleventh Amendment's express grant of state sovereign immunity, is unpersuasive and fails in the face of the broad powers delegated to Congress under the Indian Commerce Clause. U.S. Const. art. I, § 8, cl. 3.

The Tenth Amendment provides that "powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. The Supreme Court has read this Amendment as a "tautology": "If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States." *New York v. United States*, 505 U.S. 144, 156–57 (1992). The question here is straightforward: Did Congress act within its powers under the Indian Commerce Clause in passing the Gila Bend Act? If so, the Tenth Amendment is not implicated, and the constitutional challenge fails.

The Indian Commerce Clause empowers Congress "[t]o regulate Commerce . . . with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. The Supreme Court has interpreted this clause broadly: "the central function of the Indian Commerce Clause is to provide Congress with plenary power to legislate in the field of Indian affairs." *Cotton Petroleum Corp. v. New*

*Mexico*, 490 U.S. 163, 192 (1989). That "Indian relations [are] the exclusive province of federal law" is beyond dispute. *Cnty. of Oneida v. Oneida Indian Nation of New York State*, 470 U.S. 226, 234 (1985). *See also Morton v. Mancari*, 417 U.S. 535, 552 (1974) (holding that the Indian Commerce Clause empowers Congress to "single[] Indians out as a proper subject for separate legislation.").

In passing the Gila Bend Act, Congress acted within its authority and expressly stated that it was fulfilling "its responsibility to exercise plenary power over Indian affairs to find alternative land for the [Nation]." H.R. Rep. 99-851 at 7. As we learned from *Garcia v. San Antonio Metro. Transit Auth.*, courts "have no license to employ freestanding conceptions of state sovereignty when measuring congressional authority under" a constitutionally enumerated power. 469 U.S. 528, 550 (1985). Passage of the Gila Bend Act was well within congressional power under the Indian Commerce Clause and is not trumped by the Tenth Amendment.

**AFFIRMED in part, REVERSED AND REMANDED in part as to the interpretation of § 6(d).**

**Each party shall bear its own expenses on appeal.**

---

N.R. SMITH, Circuit Judge, dissenting:

"Of all the attributes of sovereignty, none is more indisputable than that of [a State's] action upon its own territory." *Green v. Biddle*, 21 U.S. 1, 43 (1823). Yet today, the majority holds that it was permissible for an agency to

exercise what Chief Justice Roberts has called "an extraordinary assertion of power"[1] by taking land into trust for an Indian reservation in the middle of one of Arizona's most populated cities, contrary to the plain language of the Gila Bend Indian Reservation Lands Replacement Act, Pub. L. No. 99-503, 100 Stat. 1798 (1986) ("Gila Bend Act"). The statutory text of the Gila Bend Act clearly prohibits the Secretary's ability to take land, that is "within the corporate limits" of a city, into trust when the city's limits wholly surround that land, such as the parcel at issue in this case.

Furthermore, even if the Gila Bend Act is "ambiguous," as the majority argues, the Supreme Court has made clear that courts should "not extend *Chevron* deference" to an agency decision where the "administrative interpretation alters the federal-state framework by permitting federal encroachment upon a traditional state power" such as the regulation of a State's land not authorized by "a clear statement from Congress." *Solid Waste Agency of N. Cook Cnty. (SWANCC) v. U.S. Army Corps of Engineers*, 531 U.S. 159, 172–74 (2001); *see also Gregory v. Ashcroft*, 501 U.S. 452, 460–64 (1991). Rather, courts should assume that, "the background principles of our federal system . . . belie the notion that Congress would use . . . an obscure grant of authority to regulate areas traditionally supervised by the States' police power." *Gonzalez v. Oregon*, 546 U.S. 243, 274 (2006). These concerns are particularly relevant here, where the Department of Interior made its decision in an ex-parte proceeding that did not involve the participation of the State of Arizona and without formal proceedings or a hearing for any other protesting parties.

---

[1] *Carcieri v. Kempthorne*, No. 07-526, Oral Arg. Tr. 36:13-17 (Nov. 3, 2008).

The majority's decision to remand to the agency is improper, because "Congress has directly spoken to the precise question" before us. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984). We should resolve this case against the agency under *Chevron* step one, because the Secretary's interpretation (1) is contrary to the plain language of the statute and (2) effectively renders political protections afforded to States in our federalism system virtually nonexistent. Thus, I must respectfully dissent.

## I.

I generally agree with the facts and procedural history as set forth by the majority. Nevertheless, additional facts are relevant to my analysis in Part II. Thus, as the late Paul Harvey would say, "here's the rest of the story."

## A.

The Tohono O'odham Nation ("the Nation") is a federally recognized Indian tribe with the second largest Tribal land base in the United States at 2.8 million acres. That land base amounts to 4,375 square miles of reservation in South and Central Arizona. To put this size in perspective, the State of Connecticut is only slightly larger, at 5,006 square miles in area. The State of Delaware is less than half the size, at 2,026 square miles.

The Gila Bend Reservation had previously been part of the Nation's land base. The reservation was nearly 10,000 acres—less than .4 percent of the Nation's total land holdings. When part of the Nation's land was flooded as a result of problems with a federal dam project, Congress

enacted the Gila Bend Act in 1986 to "replace[] . . . [Gila Bend Indian Reservation] lands with lands suitable for sustained economic use which is not principally farming . . . ." Pub. L. No. 99-503, § 2(4) 100 Stat. 1798.  Under this Act, the Nation assigned to the United States all rights and title to 9,880 acres of the Gila Bend Reservation for $30 million.  *Id.* at § 4(a).  The Nation was then authorized to purchase replacement land, and the Secretary was authorized to take 9,880 acres of replacement land into trust, which would create a new Indian reservation.  *Id.* at §6.

In 2002, the Nation, along with many other tribes, publicly supported Proposition 202—a ballot measure designed to prevent construction of new casinos in Arizona cities.  The Nation publicly asserted that it would not authorize additional Indian casinos in any cities.

Then in 2003, the Nation bought Parcel 2 within the City of Glendale through a series of complex transactions using a shell company with an out-of-state address.  Parcel 2 is land that is physically within Glendale's corporate limits, but as a "county island," it is unincorporated land under the jurisdiction of Maricopa County.  County islands stem from a once-common practice called "strip annexation."  This type of annexation occurs when a city "extend[s its] boundaries by annexing long strips of property" that encircle other, unincorporated areas.  *Republic Inv. Fund I v. Town of Surprise*, 800 P.2d 1251, 1254-55 (Ariz. 1990) (en banc).

The practical benefits a city enjoys once unincorporated land is surrounded by the city's jurisdictional boundaries are two-fold.  First, cities are able to "exercise a strong degree of control over zoning and development" of county islands, because a city's land-use planning documents and zoning

ordinances are able to guide the zoning and subdivision of county islands. *Carefree Improvement Ass'n v. City of Scottsdale*, 649 P.2d 985, 986–87, 992 (Ariz. Ct. App. 1982); Ariz. Rev. Stat. § 11-814(G) ("The rezoning or subdivision plat of any *unincorporated area completely surrounded* by a city or town shall use as a guideline the adopted general plan and standards as prescribed in the subdivision and zoning ordinances of the city or town after April 10, 1986." (emphasis added)). Second, generally no other municipality can annex unincorporated land such as Parcel 2 that is within a city's geographic limits. *See Carefree Improvement Ass'n*, 649 P.2d at 986; Ariz. Rev. Stat. § 9-101.01.

The City of Glendale's exterior corporate boundary was extended to encircle Parcel 2 in 1977. Since that time, Glendale has controlled and guided the zoning and subdivision development of Parcel 2 and the surrounding land. Indeed, Parcel 2 is part of Glendale's Municipal Planning Area and is included in Glendale's General Plan. Currently, Parcel 2 has a rural zoning designation (R-43) that would allow only limited development.

The City of Glendale developed the surrounding area in reliance on its ability to control the zoning designation and land-use of Parcel 2 under this legal scheme. For instance, in 2005 Glendale finished building a new public high school directly across the street from what Glendale later learned was the Nation's acreage. Glendale, as well as private parties, has also invested significant resources in the area by building a $450 million stadium, a $240 million arena, and a $120 million Major League Baseball training facility.

In January 2009, the Nation transferred ownership of Parcel 2 to itself. Only days later, it filed its application

asking the Secretary to take the property into trust and grant the Nation permission to establish a Class III, Las Vegas-style gambling facility.   25 U.S.C. § 2703.   The Nation has advertised that this "new casino will be the largest in the state."   There are currently no gaming facilities within the City of Glendale.  More than 30,000 people live within two miles of the proposed casino in what is currently described as a "family friendly" area.

## B.

Pursuant to usual practices, the Department of Interior treated the Nation's land-into-trust application as an ex parte filing.  It never notified the public of the application, created a docket, set a pleading schedule, or held a hearing, because it was not required to do so under the notice and comment provisions of 25 C.F.R. §§ 151.10 and 151.11(d). Opponents of the application (who happened to be aware of the proceedings) were able to submit arguments against the application by letter only.  Though the majority makes much of these "lengthy submissions," Maj. Op. 13–14, the length of the letters submitted by these parties hardly improved the process by which these parties could contest the Secretary's actions.  The opposing parties were never alerted when the Secretary filed amendments to its application.  Further, the State of Arizona did not even participate in this limited fashion.

In 2010, the Secretary concluded that Parcel 2 was eligible to be taken into trust under the Gila Bend Act.  The Secretary determined that "the meaning of 'corporate limits' is plain" and "shows a clear intent to make property eligible under the Act if it is on the unincorporated side of a city's boundary line."  The Department of Interior then published a

Federal Register notice announcing its final determination "to acquire Parcel 2 consisting of 53.54 acres of land into trust for the Tohono O'odham Nation . . . ."   75 Fed.Reg. 52550–01, 52550 (Aug. 26, 2010).  The Secretary has stayed the acquisition for litigation proceedings.

Plaintiffs sought review in district court.  There, they raised both statutory and constitutional arguments that had been raised before the agency.  The district concluded that the "within the corporate limits" phrase was "ambiguous" and applied *Chevron* deference to uphold the agency's decision. *See Chevron*, 467 U.S. at 842–43.[2]  Plaintiffs sought an injunction to block the Secretary from taking Parcel 2 into trust during the appeal; the district court granted the injunction, concluding that Plaintiffs raised "difficult" and "substantial legal questions warranting more deliberative consideration on appeal."  The district court also concluded there would be irreparable harm, because Glendale would lose its right to annex the land if it were taken into trust, which would lead to "irreparable quality-of-life injuries from gaming activities on Parcel 2."[3]

---

[2] The majority says that the district court "conclud[ed] that the Secretary of the Interior correctly applied the" Gila Bend Act.  Majority Op. 10. This is a slight misstatement.  The district court found "the meaning of 'within the corporate limits' to be ambiguous" in the Gila Bend Act.  *Gila River Indian Cmty. v. United States*, 776 F. Supp. 2d 977, 987 (D. Ariz. 2011).  After conducting its own analysis and finding both parties' interpretation plausible, the district court contemplated what it must do when "both sides advocate reasonable interpretations" and concluded that it "must defer to the agency's interpretation." *Id.* at 989.  Thus, the court deferred to the agency's interpretation because it was reasonable, but it did not necessarily find that it was the correct interpretation.

[3] The district court also enjoined Glendale from annexing Parcel 2 to preserve the status quo.

## II.

The majority concludes that the phrase "within the corporate limits" in the Gila Bend Act is "ambiguous," and thus remands to the agency to allow the Secretary "to bring his expertise to bear to interpret the provision anew." Maj. Op. 21. I disagree that the phrase is ambiguous for two reasons.

## A.

First, as the Supreme Court has held, "the susceptibility of [a] word . . . to alternative meanings does not render the word whenever it is used, ambiguous, particularly where all but one of the meanings is ordinarily eliminated by context." *Carcieri v. Salazar*, 555 U.S. 379, 390 (2009) (alterations and internal quotation marks omitted). In *Carcieri*, the Supreme Court ruled in favor of the State and prevented an Indian tribe from taking land into trust in the middle of a city by concluding that the statute was "clear." *Id.* The Court arrived at this conclusion despite the conclusion of the court of appeals below that the statute was ambiguous.

Here, as in *Carcieri*, the statutory context makes clear that "within the corporate limits" refers to land that is geographically enclosed in the jurisdictional limits of a city. Under the Gila Bend Act, the Secretary can only take land into trust upon the completion of certain statutory conditions, the most important of which are in Section 6(d) and relate to the size and location of land parcels:

> The Secretary, at the request of the Tribe, shall hold in trust for the benefit of the Tribe any land which the Tribe acquires pursuant to

subsection (c) which meets the requirements of this subsection. . . . Land *does not* meet the requirements of this subsection if it is outside the counties of Maricopa, Pinal, and Pima, Arizona, or *within the corporate limits of any city or town*. Land meets the requirements of this subsection only if it constitutes *not more than three separate areas consisting of contiguous tracts*, at least *one of which areas shall be contiguous to San Lucy Village*. The Secretary may waive the requirements set forth in the preceding sentence if he determines that additional areas are *appropriate*.

Pub. L. No. 99-503, § 6(d) 100 Stat. 1798 (emphasis added).

Thus, the plain language of the Gila Bend Act makes clear that it was aimed at allowing the Nation to assemble new reservation land consisting of a few large tracts of land, none of which were within a city. While the Secretary could waive the contiguity and three-tract requirements where "appropriate," the committee report indicates that Congress anticipated "appropriate" circumstances to include only those situations where parcels were "not entirely contiguous," but were "sufficiently close to be reasonably managed as a single economic unit or residential unit." H.R. Rep. No. 99-851, at 11 (1986). Parcel 2 is more than 100 miles from the Nation's existing reservation. Nothing in the text of Section 6(d) anticipates that Arizona expected trust land to be purchased in little patches sprinkled throughout the State, and particularly not inside the exterior boundary of cities. Rather, the Gila Bend Act makes land ineligible to be taken into trust

if it lies physically inside, or within, the boundary, or limits of a city.

When there is "no evidence that the words . . . have acquired any special meaning in trade or commerce, they must receive their ordinary meaning" based on "the common language of the people . . . ." *Nix v. Hedden*, 149 U.S. 304, 306–07 (1893).  The ordinary meaning of "within" is defined as "[i]n or into the inner part; inside."  *The American Heritage Dictionary* 1471 (1976).  "Limit" means "the final or furthest confines, bounds, or restriction of something." *Id.* at 758.  Thus, Parcel 2 is *within* Glendale's corporate limits, because it is "inside" the "final or furthest confines" or "bounds" of the City.[4]  This is the obvious, plain meaning of the text that Congress likely understood when enacting Section 6(d) of the Gila Bend Act.

In contrast to this natural reading of the statute, the United States and the Nation argue that there are "two relevant boundaries: the city's exterior boundary and the interior boundary," and "only land that is between those two boundaries" is within corporate limits.  Such an interpretation strains common sense, and is certainly not the obvious reading of the statute based on the "common language of the people." *Nix*, 149 U.S. at 307.  If Congress had wanted to

---

[4] In its cross motion for summary judgment, the United States also agreed to the Black's Law Dictionary definition "within" and "limit." "Within" is defined as "[i]n inner or interior part of." *Black's Law Dictionary* 1602 (6th ed. 1990).  "Limit" is defined as "[b]oundary, border, or outer line of a thing." *Id.* at 926.  These definitions also support a plain meaning interpretation of the Gila Bend Act supporting the City's interpretation, because Parcel 2 is in the "inner or interior part of" the City's "[b]oundary, border, or outer line."

refer to two boundaries, or to incorporated land only, it could have easily made that distinction.

Indeed, other statutes by Congress in similar circumstances indicate that, if Congress only wished to refer to a municipality's incorporated or annexed land, it knew how to do so. *See, e.g.*, 25 U.S.C. § 1724(i)(2) (allowing Indian tribe to use government-provided funds to purchase "acreage within . . . *unincorporated areas* of the State of Maine" (emphasis added)); *see also* Pub. L. No. 102–402, § 4(d)(1), 106 Stat. 1961, 1965 (1992) (referring to "*annexation of lands* within the refuge by any unit of general local government" (emphasis added)); Pub. L. No. 101–514, 104 Stat. 2074, 2076 (1991) (referring to "all *incorporated units* within the town of Matewan" (emphasis added)); Pub. L. No. 100–693, § 3(a), 102 Stat. 4559 (1988) (referring to "the *incorporated area* of the cities of Union City and Fremont" (emphasis added)). This contradicts the argument of the United States and the Nation that "within the corporate limits" means both within the exterior and the interior corporate limits of a city.

Furthermore, even if the "within the corporate limits" phrase does have a specific "settled meaning," (as the United States and the Nation contend), the background legal norms, against which Congress is presumed to be aware when it legislates, most clearly supports the City of Glendale's interpretation of the statute. The most relevant background legal norm to the Gila Bend Act is Arizona state law, because the Gila Bend Act only affects Arizona, and it is "a fair and reasonable presumption . . . that [C]ongress" is aware of "state legislation" when the act of Congress has an effect on that law. *See Prigg v. Commw. of Pa.*, 41 U.S. 539, 598–99 (1842); *see also Brock v. Writers Guild of Am., W., Inc.*,

762 F.2d 1349, 1358 n.8 (9th Cir. 1985) ("[B]ecause Congress is composed predominately of lawyers, court[s] may assume that Congress is aware of existing law.").

Notably, Arizona's zoning ordinances use the "within corporate limits" phrase in the geographical sense. For instance, Arizona Revised Statutes Section 9-461.11(A) allows a municipality to exercise its "planning powers" over "unincorporated territory" that is "*within its corporate limits* . . . ." (emphasis added). *See also id.* § 9-462.07(A) (same).

The Arizona Supreme Court has also interpreted the words "corporate limits" to refer to a municipality's "exterior boundar[ies]," holding that a state university campus was located "within" the City of Flagstaff's corporate limits, because it was "completely surround[ed]" by the "exterior boundary of Flagstaff." *Flagstaff Vending Co. v. City of Flagstaff*, 578 P.2d 985, 987 (Ariz. 1978) (in banc). The court emphasized that "the ordinary meaning of 'within'" is "on the innerside . . . inside the bounds of a region." *Id.* (internal quotation marks omitted) (quoting *Webster's Third New International Dictionary* 2627 (1965)). Notably, the Arizona Supreme Court's interpretation turned on the geographic location of the campus, not its jurisdictional status.

While not binding on this court, *Flagstaff Vending* is persuasive authority that Congress understood "within the corporate limits" to refer to the geographic boundaries of a city when the Gila Bend Act was passed. This is particularly likely, because *Flagstaff Vending* was decided only eight years before two of Arizona's representatives (Representative Morris K. Udall and then Representative John McCain) sponsored the Gila Bend Act.

Though the majority relies on situations where Congress has used the phrase "exterior boundaries," these statutes are completely inapposite. Maj. Op. 23 (citing 16 U.S.C. § 485; 25 U.S.C. § 465). These statutes are in no way referring to unincorporated islands of land surrounded by an outer corporate limit, and thus there is nothing to indicate these statutes would have any bearing on this factually distinct situation. Rather, they merely refer to the "exterior boundary" of an area, such as a national forest. Furthermore, as discussed above, the Arizona Supreme Court had already interpreted "corporate limit[]" to be synonymous with "exterior boundary." *Flagstaff Vending Co.*, 578 P.2d at 987. It is likely that Congress also viewed these phrases as synonymous, so there is nothing significant about Congress using the "exterior boundaries" phrase in these statutes.

The Nation is correct that Arizona's 1977 annexation ordinance "extended" the City of Glendale's "present corporate limits . . . to include" a strip of land surrounding Parcel 2. But that merely meant that the annexed strip then formed part of the "corporate limits." The encircled land (Parcel 2) still fell within those limits. Nothing about this ordinance defined the term "within" in a way that would detract from this plain meaning.[5]

---

[5] The majority cites to Arizona Revised Statutes Section 9-500.23, a non-zoning ordinance about fire and safety, which "outside corporate limits" in a jurisdictional sense. However, the jurisdictional usage makes sense in this context, because which entity is authorized to provide fire and safety services is an issue of authority and jurisdiction. In fact, this ordinance is entitled "Authority to provide fire protection and emergency services outside corporate limits." Thus, the jurisdictional nature of the "corporate limits" phrase used there is distinguishable from the geographic nature of the phrase used in a zoning context, and the majority's reliance on this ordinance is misplaced.

Notably, in a 1992 Legal Brief, the Department of the Interior itself recognized that Section 6(d) created "geographical requirements" to take the land into trust only if it was "outside the corporate limits of any city or town." Brief for Appellee at 4, *Tohono O'odham Nation v. Bureau of Indian Affairs*, 22 IBIA 220 (I.B.I.A. Aug. 14, 1992). This position is directly contrary to the Department's July 2010 position in this case that the "within the corporate limits" phrase is "jurisdictional in nature."

"If the plain language of [the Act] renders its meaning reasonably clear," the court "will not investigate further unless its application leads to unreasonable or impracticable results." *United States v. Fei Ye*, 436 F.3d 1117, 1120 (9th Cir. 2006) (internal quotation marks omitted). Therefore, because the meaning of the Act is clear at step one of the *Chevron* analysis, no deference is owed to the Secretary's interpretation. *See Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 600 (2004) ("Even for an agency able to claim all the authority possible under *Chevron*, deference to its statutory interpretation is called for only when the devices of judicial construction have been tried and found to yield no clear sense of congressional intent.").

---

Other state cases interpreting identical "within the corporate limits" language have come to the same conclusion as the Supreme Court of Arizona. *See, e.g.*, *Village of Frankfort v. Ill. EPA*, 852 N.E.2d 522, 524 (Ill. App. Ct. 2006) (referring to unincorporated land "within the corporate limits of Frankfort"); *City of Des Moines v. City Dev. Bd.*, 335 N.W.2d 449, 450 (Iowa Ct. App. 1983) (city "notified respondent . . . that the city would not provide essential services to isolated unincorporated areas within the corporate limits of the city"); *Town of Germantown v. Village of Germantown*, 235 N.W.2d 486, 491 (Wis. 1975) (interpreting statute as giving municipalities an opportunity to annex islands "lying within the corporate boundaries").

## B.

Even if the majority is correct that the statute is ambiguous, there is a second reason that the majority's decision to remand is incorrect. The Supreme Court's federalism canon of construction,[6] which operates at step one

---

[6] The United States argues that the Indian canon of construction, requiring a liberal interpretation of statutes in favor of Indians, requires a ruling for the Nation if the Gila Bend Act is ambiguous. *See Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985). However, the district court found that the Secretary's interpretation would adversely affect the economic interests of other Indian tribes in Arizona. This canon does not appear to apply when it will benefit one tribe at the expense of other Indian tribes. *See Confederated Tribes of Chehalis Indian Reservation v. Washington*, 96 F.3d 334, 340 (9th Cir. 1996) (declining to apply canon where multiple tribes dispute fishing rights); *see also Northern Cheyenne Tribe v. Hollowbreast*, 425 U.S. 649, 655 n.7 (1976) (declining to apply canon because the "contesting parties are an Indian tribe and a class of individuals consisting primarily of tribal members").

Furthermore, Supreme Court precedent suggests that when the Indian canon conflicts with the federalism canon, the federalism canon prevails. *See, e.g.*, William N. Eskridge, Jr. et. al., *Legislation and Statutory Interpretation* 374–75 (2d ed. 2006) ("[T]he canon promoting interpretations favoring Native Americans has weakened considerably in recent years, in the aftermath of jurisdictional disputes where states have prevailed over tribes." (citing *South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329 (1998); *Blatchford v. Native Village of Noatak*, 501 U.S. 775 (1991); *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163 (1989)); Philip P. Frickey, *A Common Law for Our Age of Colonialism: The Judicial Divestiture of Indian Tribal Authority over Nonmembers*, 109 Yale L.J. 1 (1999)); William N. Eskridge, Jr. & Philip P. Frickey, *Quasi-Constitutional Law: Clear Statement Rules As Constitutional Lawmaking*, 45 Vand. L. Rev. 593, 628 (1992) ("*Gregory*, and the federal criminal cases also may have dramatically deflated the longstanding canon presuming that states have no regulatory role in Indian country.").

of the *Chevron* analysis[7] as a normal tool of judicial interpretation,[8] makes clear that this court is required to interpret an ambiguous statute in favor of substantial state interests absent a clear indication that Congress intended otherwise. *See SWANCC*, 531 U.S. at 172-74; *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 208-09 (1998); *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 544–45 (1994); *Gregory v. Ashcroft*, 501 U.S. 452; *see also Gonzalez v. Oregon*, 546 U.S. at 295–300 (discussing the clear statement rule); *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65 (1989) ("The language of § 1983 also falls far short of satisfying the ordinary rule of statutory construction that if Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute." (internal quotation marks omitted)); *United States v. Bass*, 404 U.S. 336, 349 (1971) ("[U]nless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance.").     A

---

[7] Generally, "canons of interpretation are considered to be part of the traditional tools available to the Court at Step One" of the *Chevron* analysis. *See* William N. Eskridge, Jr. et al., *Legislation and Statutory Interpretation* 335 (2d ed. 2006); *see also* Kenneth A. Bamberger, *Normative Canons in the Review of Administrative Policymaking*, 118 Yale L.J. 64, 77 (2008) ("The largest group of cases to consider the place of normative canons in review of agency interpretations treats them as the type of 'traditional tools' that courts may use to resolve textual ambiguity, even when faced with an agency construction that might otherwise be entitled to deferential *Chevron* review.").

[8] "In determining if Congress has 'an intention on the precise question at issue,' [the Court] employ[s] 'traditional tools of statutory construction.'" *Hamilton v. Madigan*, 961 F.2d 838, 840 n.3 (9th Cir. 1992) (quoting *Chevron*, 467 U.S. at 843 n.9).

discussion of the background justifications for this clear statement rule illustrates the relevance of this canon here.

The debate over what constitutes the appropriate balance of power between the states and federal government and—more relevant to this case—how that balance of power should be enforced, dates back to the founding of this nation. Regarding the specific interpretation that should be given to the Tenth Amendment, one position in this debate has been that it is the role of the judiciary to protect state interests by interpreting the Tenth Amendment as a substantive limit on federal power. The competing argument is that States are able to adequately protect their interests through the political process, so no additional judicial protections should be provided. Over the course of American history, federal courts have not always taken consistent positions on this issue.[9]

For instance, prior to *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528 (1985), the Supreme Court had, from time to time, employed the Tenth Amendment as a substantive limit on the federal government's ability to

---

[9] *Compare Hammer v. Dagenhart*, 247 U.S. 251 (1918) (holding that a federal law prohibiting interstate shipment of goods that utilized child labor violated the Constitution, because "[t]he power of the States to regulate their purely internal affairs by such laws as seem wise to the local authority is inherent and has never been surrendered to the general government"); *Bailey v. Drexel Furniture Co.*, 259 U.S. 20, 38 (1922) (same), *with United States v. Darby*, 312 U.S. 100, 124 (1941) (holding that a federal law prohibiting shipment of goods made by children was Constitutional, because the Tenth Amendment was merely a reminder that "all is retained which has not been surrendered").

exercise power.[10]  The case of *National League of Cities v. Usery*, 426 U.S. 833 (1976) was a Supreme Court case that used the Tenth Amendment in this manner.

In *Garcia*, the Court expressly overruled *National League of Cities*, because using the Tenth Amendment as a substantive limit on Congress proved "unworkable in practice," even if it had some basis in Constitutional theory. 469 U.S. at 545–47.  The Court in *Garcia* did argue for judicial restraint when it came to rules that "look[ed] to the 'traditional,' 'integral,' or 'necessary' nature of governmental functions . . . ." *Id.* at 546.  The Court also emphasized that States continue to "occupy a special and specific position in our constitutional system and that the scope of Congress' authority under the Commerce Clause must reflect that position." *Id.* at 556.

However, the Court explained that the protection of State interests occurred through the political process and not the judiciary.  "[T]he principal and basic limit on the federal commerce power is that inherent in all congressional action—the built-in restraints that our system provides through state participation in federal governmental action. The political process ensures that laws that unduly burden the states *will not be promulgated*." *Id.* (emphasis added)  The Court observed that "[i]n the factual setting of these cases the internal safeguards of the political process have performed as intended." *Id.*

---

[10]  *See, e.g.*, *Carter v. Carter Coal Co.*, 298 U.S. 238 (1936) (invalidating the Bituminous Coal Conservation Act of 1935 on federalism grounds); *United States v. Butler*, 297 U.S. 1 (1936) (striking down part of the Agricultural Adjustment Act that imposed taxes on agricultural processors under the Tenth Amendment).

Only six years after *Garcia*, the Supreme Court apparently sought to strike a compromise between these competing positions when it decided *Gregory v. Ashcroft*, 501 U.S. 452. There, the Court used the Tenth Amendment and federalism considerations as a rule of construction preventing federal laws from being interpreted in a way that burdened substantial state interests unless Congress clearly authorized such an interpretation of the law. The Court explained, "inasmuch as this Court in *Garcia* has left primarily to the political process the protection of the States against intrusive exercises of Congress' Commerce Clause powers, we must be absolutely certain that Congress intended such an exercise." 501 U.S. at 464; *see also* 1 Laurence Tribe, *American Constitutional Law* 1176 (3d ed. 2000) ("[T]o give the state-displacing weight of federal law to mere constitutional ambiguity would evade the very procedure for lawmaking on which *Garcia* relied to protect states' interests.").

In other words, to the extent that *Garcia* anticipated that States would be protected by "the internal safeguards of the political process" when the political process "performed as intended," *Gregory* created a rule of construction aimed at ensuring that these political safeguards actually *had* "performed as intended" before significant state interests would be burdened. *Garcia*, 469 U.S. at 556. Thus, the *Gregory* Court explained that Congress's authority under the Supremacy Clause to preempt state law "in areas traditionally regulated by the States" is "an extraordinary power in a federalist system" that "we must assume Congress does not exercise lightly." 501 U.S. at 460.

A canon of construction favoring a State's sovereign interests is not new. The Supreme Court has long explained

that when federal law is arguably inconsistent with state law, courts must "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947).[11]   However, the Supreme Court's decision in *Gregory* appears to have transformed this presumption into a much more exacting clear statement rule requiring additional clarity from Congress.[12]

As the dissent in *Gregory* noted, to overcome a federalism presumption, Congress would be required both to make clear 1) that the statute was intended to extend "to the States" at all, and 2) Congress must also be clear as to whether "the precise details of the statute's application" were meant to apply to the specific state activities at issue.  501 U.S. at 476  (White, J., dissenting).[13]

---

[11] *See also Employees of the Dep't of Pub. Health & Welfare v. Dep't of Pub. Health & Welfare*, 411 U.S. 279, 284–85 (1973); *Bass*, 404 U.S. at 349.

[12] *See* William N. Eskridge, Jr. et al., *Legislation and Statutory Interpretation* 368 (2d ed. 2006); Note, *Federalism—Clear Congressional Mandate Required to Preempt State Law: Gregory v. Ashcroft*, 105 Harv. L. Rev. 196, 201–02 (1991) ("The Court has long required Congress to state clearly its intent to upset the usual balance of power between the states and the federal government. . . . *Gregory*'s plain statement rule, however, represents a new, more exacting rule of statutory construction.").

[13] *See also Federalism—Clear Congressional Mandate Required to Preempt State Law: Gregory v. Ashcroft*, *supra* note 11, at 202 ("In *Gregory*, the Court created a two-tier inquiry.  First, Congress must clearly intend to extend a law to the states . . . .  Second, Congress must delineate which specific state governmental functions it wishes to include within the sweep of the federal law.").

Thus, even if the Gila Bend Act is, as the majority concludes, "ambiguous" and "less than crystal clear," this only means that Congress never actually considered the issue of creating an Indian reservation on an unincorporated island within the geographic limits of a city. While statutory ambiguity in other contexts generally requires courts to defer to an agency's interpretation, *Chevron*, 467 U.S. 837, the federalism clear statement rule prevents Congress from punting this highly charged political decision to the less

---

That this two-tier analysis exists is demonstrated by the fact that the Supreme Court has upheld the imposition of the exact same federal statute against states in some instances where the statute's application was clear, but not in other instances where the statute's application was less than clear. For example, in *SWANCC*, 531 U.S. at 162, the statutory interpretation question was whether an abandoned sand and gravel pit constituted "navigable waters," as interpreted by the United States Army Corps of Engineers. The Supreme Court struck down the application of the "navigable waters" provision in the Clean Water Act to a land-locked gravel pit in one instance. 531 U.S. at 162 ("We are asked to decide whether the provisions of § 404(a) may be fairly extended to *these* waters . . . ." (emphasis added)). This was because, though it was clear that the Clean Water Act could be applied by agencies against the states *in general*, the intrusive application in *SWANCC* was not clearly authorized by Congress in that case, where the application raised heightened federalism concerns. But the Court noted that, in *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 134 (1985), the Court upheld the application of the exact same statute to water that was adjacent to and "inseperably bound up with" navigable waters. *Id.* at 167.

Similarly, in *Gregory*, the Supreme Court struck down the application of the ADEA to potentially include retirement requirements on state judges. 501 U.S. 452. But in *Kimel v. Florida Bd. of Regents*, 528 U.S. 62 (2000), the Supreme Court found the same statute, the ADEA, satisfied the clear statement rule regarding Congress's intention to abrogate states' Eleventh Amendment immunity.

politically accountable agency, *SWANCC*, 531 U.S. at 172; *Gregory*, 501 U.S. 452.[14]

For instance, in *SWANCC*, the agency specifically requested that *Chevron* deference be provided, because Congress "did not address the precise question of [the statute's] scope with regard to nonnavigable, isolated, intrastate waters, and that, therefore, [the Court] should give deference to the [agency's] 'Migratory Bird Rule.'" 531 U.S. at 172. The Seventh Circuit had deferred to the agency's interpretation after determining that the interpretation was "reasonable." *Id.* at 166. However, the Court reversed the Seventh Circuit and explicitly stated that, "even were we to agree with respondents, we would not extend *Chevron* deference here." *Id.* at 172. The Court invoked the federalism cannon of statutory interpretation and explained that its concern with the agency's interpretation was "heightened where the administrative interpretation alters the federal-state framework by permitting federal encroachment upon a traditional state power." *Id.* at 173 (citing *Bass*, 404 U.S. at 349 ("[U]nless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance.")). Thus, because the Court found "nothing approaching a clear statement from Congress that it intended" the statute to be applied as it was in the present case, the Court "read the statute as written to avoid the significant constitutional and federalism questions . . . and

---

[14] Clear statement canons "trump *Chevron*," because "Executive interpretation of a vague statute is not enough when the purpose of the canon is to require Congress to make its instructions clear." Bamberger, *supra* note 6, at 80 (quoting Cass R. Sunstein, *Nondelegation Canons*, 67 U. Chi. L. Rev. 316, 331 (2000)).

therefore *reject[ed] the request for administrative deference*." *Id.* (emphasis added).

Similarly, in *Gregory*, 501 U.S. 452, the majority rejected the EEOC's interpretation of the statute without even mentioning deference to the agency. It was only in Justice Blackmun's dissent where *Chevron* was discussed, and he argued that the Court should have deferred to the EEOC's interpretation of a vague statute. *Id.* at 493 (Blackmun, J., dissenting); *see also Gonzalez v. Oregon*, 546 U.S. at 264, 274 (finding that the Attorney General's interpretive rule was "not entitle[d] . . . to *Chevron* deference," based on, *inter alia*, "background principles of our federal system"). In other words, in areas where federalism concerns are implicated, it appears that a clear authorization of Congressional authority is a preliminary requirement for any deference to be accorded to the agency's interpretation of a statute.[15]

Contrary to the majority's concerns about hypothetical applications of this rule, the federalism canon of construction does not preclude deference to any agency interpretation of "any and all . . . federal legislation [that] could be construed to have at least minor, derivative implications for traditional state functions." Maj. Op. 30. Rather, the Supreme Court has

---

[15] Clear statement "canons reflect a singular requirement that certain important issues be addressed by legislative deliberation alone. More specifically, they operate as clear statement rules that bar the interpretation of a statute to push the bounds of federal power absent an unambiguous declaration of intent by Congress." Bamberger, *supra* note 6, at 79 (citing Cass R. Sunstein, *Beyond Marbury: The Executive's Power To Say What the Law Is*, 115 Yale L.J. 2580, 2607 (2006)). The canons also "force a democratically elected Congress to deliberate on, and then raise, a question via explicit statement by operating in a manner that constrains any interpretive discretion on the part of courts and agencies." *Id.* at 80.

only applied this rule in narrow circumstances when the following three types of specific concerns arise. First, this rule has only been used by the Supreme Court in particular substantive legal "areas traditionally supervised by the States' police power." *Gonzalez v. Oregon*, 546 U.S. at 274. The Supreme Court has demonstrated its commitment to protecting a State's ability to regulate the land use and private property rights within its own territory. For instance, in *SWANCC*, the Supreme Court recognized that the agency's interpretation would result in "a significant impingement of the States' traditional and primary power over land and water use" as a justification for invoking the clear statement rule. 531 U.S. at 174; *see also Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 44 (1994) ("[R]egulation of land use [is] a function traditionally performed by local governments."). Similarly, in *BFP*, 511 U.S. at 544–45, the majority opinion invoked the *Gregory* clear statement rule in support of a reading that prevented federal law from trumping state law concerning the regulation of private property rights.

Second, the clear statement rule only applies when "a statute [is] susceptible of two plausible interpretations, one of which would have altered the existing balance of federal and state powers." *Salinas v. United States*, 522 U.S. 52, 59, 118 S. Ct. 469, 474, 139 L. Ed. 2d 352 (1997); *see also United States v. Nordic Vill., Inc.*, 503 U.S. 30, 34 (1992) (applying a similar rule of construction where a was "susceptible of at least two interpretations," one of which was more intrusive on a state's interests). For instance, in *Coeur Alaska, Inc. v. Southeast Alaska Conservation Council*, 557 U.S. 261, 265, 273 (2009), the clear statement rule did not apply, because the question was merely about *which* agency had authority to issue discharge permits, rather than *whether* an agency had authority to perform the action at all.

Though the Court explained that the statute may be ambiguous, either interpretation had a similar effect on the State's interests, and thus the Court deferred to the agency's interpretation rather than applying the clear statement rule. *Id.* at 274–75.

In contrast, in *Gregory*, one interpretation of the ADEA would have allowed an agency to regulate retirement requirements for state judges—a significant intrusion on state interests, whereas the other interpretation would not allow such regulation. 501 U.S. at 469. Similarly in *SWANCC*, the potential ambiguity in the Clean Water Act was over whether or not the Army Corps could regulate a land-locked, abandoned gravel pit "wholly located within two Illinois counties," despite the fact that the agency *did* clearly have authority under the same statute to regulate other state land that "actually abutted on a navigable waterway." 531 U.S. at 167, 171. The Court noted that, while the text of the Clean Water Act supported the latter interpretation, there was nothing to indicate that Congress had supported the former "more expansive" interpretation of "navigable waters." *Id.* at 168–71. In other words, the type of ambiguity in the statute must be such that it is not clear that the State was able to protect its significant interests through the political process, because the State may not have been on notice that its important interests were at stake.

Third (and this factor applies only in the administrative context), the Supreme Court seems more likely to apply this clear statement requirement when the agency interprets the scope of its own statutory authority to regulate in the traditional state realm at issue. For instance, in *Gonzalez v. Oregon*, the Supreme Court explained that it is a "commonsense conclusion" that "[j]ust as the conventions of

expression indicate that Congress is unlikely to alter a statute's obvious scope and division of authority through muffled hints, the background principles of our federal system also belie the notion that Congress would use such an obscure grant of authority to regulate areas traditionally supervised by the States' police power."  546 U.S. at 274. The Court thus explained that "[t]he idea that Congress gave the Attorney General such broad and unusual authority through an implicit delegation . . . is not sustainable." *Id.* at 267.  The Court quoted *Whitman v. American Trucking Associations, Inc.*, 531 U.S. 457, 468 (2001), where it had previously explained that "Congress, we have held, does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Id.*[16]

This concern regarding the agency's interpretation of its own statutory authority compounds when the agency's interpretation of the authority-granting statute itself strains the bounds of Congress's constitutional authority.  For example, in *SWANCC*, the Court explained that "[w]here an

---

[16] *See also Wyeth v. Levine*, 555 U.S. 555, 576–77 (2009) (the Court gave no weight to the agency's conclusion that state law is pre-empted); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000) ("[W]e are confident that Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion."); Robin Kundis Craig, *Administrative Law in the Roberts Court: The First Four Years*, 62 Admin. L. Rev. 69, 171 (2010) ("The Roberts Court's track record to date indicates that it will generally accord far less deference to a federal agency when the agency is determining the scope of its own jurisdictional authority. This inclination is particularly strong when the agency is expanding its authority into realms that the Court perceives as the states'—for example, regulation of doctors, *retention of legal authority over land, and land-use planning*." (emphasis added)).

administrative interpretation of a statute invokes the outer limits of Congress' power, we expect a clear indication that Congress intended that result." 531 U.S. at 172. The Court explained that this concern stems from the "assumption that Congress does not casually authorize administrative agencies to interpret a statute to push the limit of congressional authority." *Id.* at 172–73. However, while constitutional limits may heighten concerns about authority, clear statement rules "cannot be defended as a simple invocation of the rule about avoiding serious constitutional questions," because these rules apply even in situations where, "if Congress acted with the requisite clarity, the statute would be constitutional." William N. Eskridge, Jr., et. al., *Legislation and Statutory Interpretation* 368 (2d ed. 2006).

Under this third concern, the federalism clear statement rule is satisfied when a statutory grant of authority to an agency is without reservation and clearly encompasses the scope of the subject matter. *See Yeskey*, 524 U.S. at 208–10. But when there is some reservation of authority and it is not clear if the agency's interpretation is statutorily authorized, the clear statement rule applies in full force. *SWANCC*, 531 U.S. at 172-74; *Gregory*, 501 U.S. 452; *see also Gonzalez v. Oregon*, 546 U.S. at 295–300.

All three of the specific concerns related to the federalism canon are present in this case. First, the Secretary's interpretation of the Gila Bend Act clearly implicates Arizona's "traditional and primary power over land . . . use" and private property rights within its territory. *See SWANCC*, 531 U.S. at 174. I am surprised by the majority's argument that no "encroachment on *state power*" is at issue in this case. Maj. Op. 30 (emphasis added). Although the City of Glendale is a municipality, in *SWANCC*, the land at issue was

only a "*municipal* landfill," and yet the Supreme Court still determined that the federal government's attempt to regulate this land constituted "a significant impingement of the States' traditional and primary power."  *Id.* at 173–74 (emphasis added).  Moreover, as discussed below, it is Arizona's state-wide zoning scheme created under Arizona state law (a scheme that allows cities to develop and lay claim to land enclosed within a cities corporate limits, even if that land is not incorporated) that will be interrupted by the Secretary's application of the Gila Bend Act in this case.  It is Arizona state citizens that will be affected by Parcel 2 being taken into trust just across the street from their neighborhoods.  It is also land located within Arizona's "own territory" that will be effectively transferred to another sovereign. *Green v. Biddle*, 21 U.S. at 43.  Even the Federal Government's brief recognizes that "jurisdiction over Indian lands involves 'an accommodation between the interests of the Tribes and the federal government, on the one hand, and *those of the State*, on the other.'"  Federal Appellees' Answering Br. 48 (emphasis added) (quoting *Nevada v. Hicks*, 533 U.S. 353, 361-62 (2001)).  The Federal Government's brief also notes that the Secretary's decision to take Parcel 2 into law will result in a "[d]isplacement of *state* law . . . ."  *Id.* at 50 (emphasis added).

The majority's argument that Arizona never "articulated a state sovereignty or constitutional interest vis-a-vis § 6(d)" also "puzzled" me. Maj. Op. 29–30. Arizona clearly argued (multiple times throughout both the opening and reply brief) that the Gila Bend Act, which includes Section 6(d), "as applied violates the Tenth Amendment" and invades "essential attributes inhering in [Arizona's] sovereign status." Arizona Appellants' Opening Br. 49, 51. All parties were also ordered by our panel to discuss the application of the

federalism clear statement rule to this case at oral argument, at which time Arizona argued that the clear statement rule specifically applies to an interpretation of Section 6(d), and state sovereignty concerns require construing any ambiguity in the Gila Bend Act in Arizona's favor.[17]  I do not address Arizona's argument that the Tenth Amendment and state sovereignty concerns create a substantive constitutional limit that prevents the Secretary from "tak[ing Parcel 2] into trust in the first place," Arizona Appellants' Reply Br. 27, nor do I address Arizona's other concerns with the Gila Bend Act and the Secretary's interpretation of it, because I conclude that the federalism canon's procedural requirement for added clarity, as applied to Section 6(d)'s language alone, requires a ruling for Arizona and Glendale.

Second, the statutory interpretation debate over the Gila Bend Act is over one interpretation that would significantly burden Arizona's substantial state interests and another interpretation that is much less intrusive.  The Secretary's application of the Gila Bend Act would interfere with Arizona's sovereign powers more than the typical creation of

---

[17] It is worth noting that, in *BFP*, 511 U.S. 531, the Supreme Court invoked the clear statement canon in favor of the State despite the fact that neither the Ninth Circuit nor any party had discussed the clear statement rule.  Our precedent is also clear that, even if Arizona did make a concession about a question of law, there is "no reason why we should make what we think would be an erroneous decision, because the applicable law was not insisted upon by one of the parties." *United States v. Miller*, 822 F.2d 828, 832 (9th Cir. 1987) (quoting *Smith Engineering Co. v. Rice*, 102 F.2d 492, 499 (9th Cir.1938)).  "The rule has been repeated in a variety of circumstances.  Even if a concession is made by the government, we are not bound by the government's 'erroneous view of the law.'" *Id*. (quoting *Flamingo Resort, Inc. v. United States*, 664 F.2d 1387, 1391 n. 5 (9th Cir.1982)).  This is particularly true where all parties had the chance to address this issue at oral argument.

an Indian reservation, regardless of whether a casino is ever actually built on Parcel 2.  It is a commonsense conclusion that a state has a greater concern about how land within its cities is used than land outside its cities.  *SWANCC*, 531 U.S. at 167, 171 (recognizing a heightened concern over land "wholly located within two Illinois counties" compared to land that "actually abutted on a navigable waterway").

Furthermore, ordinary land use concerns are heightened by the fact that in Arizona, municipalities expect to be able to "exercise a strong degree of control over zoning and development" over land within their geographic boundaries, even if the land is not incorporated.  *Carefree Improvement Ass'n*, 649 P.2d at 987; Ariz. Rev. Stat. § 11-814(G).  A city's land-use planning documents and zoning ordinances are able to guide the zoning and subdivision of county islands. *Carefree Improvement Ass'n*, 649 P.2d at 986–87, 992.  In addition, in Arizona, generally no other municipality can annex unincorporated land such as Parcel 2 that is within a city's geographic limits.   *Id.* at 986; Ariz. Rev. Stat. § 9-101.01; *see also Kane v. City of Beaverton*, 122 P.3d 137, 142 (Or. Ct. App. 2005) ("[T]here are a number of rational and legitimate reasons for disparate treatment of 'island' territories . . . .").     Thus, Glendale had reasonable expectations that it would be able to guide and control Parcel 2's development, and that this land could not be claimed by any other entity capable of changing the land use development.  In reliance on this zoning scheme, the City of Glendale zoned Parcel 2 as residential and developed the surrounding area consistent with that zoning designation. These reliance interests would not exist to the same extent in the hypothetical the majority poses, regarding "acquiring land in trust immediately adjacent to a city's outermost boundary

or even land that was almost, but not entirely encircled by corporate land."[18]  Maj. Op. 31.

The State's territorial control—the ability to tax, to regulate, and to control land use—is effectively eliminated when state land is taken into trust.  As courts have noted, "federally-recognized reservations . . . are, in many ways, separate jurisdictions from the state in which they are located." *Tworek v. United States*, 46 Fed. Cl. 82, 87 (2000). Importantly for this case, tribal sovereignty blocks "state action that impairs the ability of a tribe to exercise traditional governmental functions such as *zoning* . . . or the exercise of general civil jurisdiction over the members of the tribe." *Crow Tribe of Indians v. Montana*, 650 F.2d 1104, 1110 (9th Cir. 1981) (emphasis added); *see also Segundo v. City of Rancho Mirage*, 813 F.2d 1387, 1390–94 (9th Cir. 1987) (rejecting a State's attempts to apply local laws such as zoning ordinances to reservation lands).  The Supreme Court has explained that one of the independent "barriers to the assertion of state regulatory authority over tribal reservations and members" is the sovereign "right of reservation Indians to make their own laws and be ruled by them."  *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136 (1980); *see also United States v. Wheeler*, 435 U.S. 313, 322 (1978) ("The powers of Indian tribes are, in general, inherent powers

---

[18] Furthermore, the question of whether land immediately adjacent to Parcel 2 and outside Glendale's city limits could be taken into trust is not a question before this court, given that it is not clear whether such land would meet other requirements of the Gila Bend Act, including that the land be "three separate areas consisting of contiguous tracts, at least one of which areas shall be contiguous to San Lucy Village," Pub. L. No. 99-503, § 6(d) 100 Stat. 1798, or else that non-contiguous parcels are "sufficiently close to be reasonably managed as a single economic unit or residential unit."  H.R. Rep. No. 99-851, at 11 (1986).

of a limited sovereignty which has never been extinguished.").    Thus, upholding the Secretary's interpretation would strip Glendale of its long-standing authority to control land use on Parcel 2 and transfer that control to a separate sovereign.

The transfer of Arizona's sovereign authority, over land enclosed within one of its major cities, is a significant encroachment on Arizona's state interests, regardless of how Parcel 2 is ultimately developed.  Moreover, the fact that taking Parcel 2 into trust would create the very real potential that a new casino would be built across the street from a high school, a quarter-mile from churches, and within Glendale's carefully developed residential area (where millions of dollars have been invested) understandably heightens the State's concerns.

Furthermore, not only would the Secretary's decision affect the State's ordinary land use powers, the agency's decision here will likely implicate major budgetary decisions. For example, if a casino is built, city officials estimate that the casino complex will require Glendale to build significant additional infrastructure in the area (e.g., fire, police, etc.), as well as to spend millions of additional dollars of expenditures for public safety outlays.  The Supreme Court has explained that "[f]ederalism concerns are heightened when, as in these cases, a federal court decree has the effect of dictating state or local budget priorities." *Horne v. Flores*, 557 U.S. 433, 448 (2009).

The political process justifications for the federalism clear statement rule are also particularly relevant here.  In contrast to *Garcia*, "[i]n the factual setting of [this case] the internal safeguards of the political process" have *not* "performed as

intended." *Garcia*, 469 U.S. at 556. As discussed above, the text of the Gila Bend Act readily lends itself to an interpretation that would prevent any reservations from being created within the geographic boundaries of a city. Thus, when two of Arizona's own representatives sponsored the Gila Bend Act in the House of Representatives, there was nothing from the text of the statute that would have alerted Arizona to the fact that it was consenting, through the political process, to legislation that would be adverse to its significant state interests. Indeed, the Arizona Supreme Court's recent decision in *Flagstaff Vending*, 578 P.2d at 987, as well as Arizona's zoning ordinances discussing unincorporated territory "within the corporate limits," Ariz. Rev. Stat. § 9-461.11(A); *id.* § 9-462.07(A), likely reinforced Arizona's understanding that land like Parcel 2 would not be eligible to be taken into trust.

To further complicate Arizona's dilemma, when the Department of Interior was considering the Nation's land-into-trust application, Arizona did not participate in this ex parte filing and had no way to formally do so. There was no public notification, no docket, no pleading schedule, and no hearing for interested parties. Opponents of the application who happened to be aware of the proceedings were able to submit arguments against the application by letter only, but they were not alerted when the Secretary filed amendments to its application. Thus, the statutory interpretation tools and facts of this case indicate that the ambiguity at issue in the "within the corporate limits" phrase was of the type that prevented Arizona from adequately protecting its state interests through the political process.

Third and lastly, the Secretary's interpretation here concerns the scope of its own authority to take this land into

trust.  While the Gila Bend Act clearly provides authority for the Secretary to take land into trust to create Indian reservations in certain locations, this grant of authority is based on significant limitations, including that such reservations not be created "within the corporate limits" of a city.  The majority concedes that the Gila Bend Act is "ambiguous" regarding whether the "within the corporate limits" language was meant to authorize the Secretary's action of taking Parcel 2 into trust.  Maj. Op. 21.  As in *Gregory*, *SWANCC*, and *Gonzalez v. Oregon*, courts should not defer to an agency's interpretation of an ambiguous grant of authority when the interpretation buts up against the limit of the agency's own authority.  This is especially true where such an interpretation may also press the outer limits of Congress's authority under the Indian Commerce Clause.  *See United States v. Lara*, 541 U.S. 193, 205 (2004) (indicating that Congress could run up against "constitutional limits" if its Indian legislation "interfere[d] with the power or authority of any State").

Therefore, even assuming the Gila Bend Act is ambiguous, ambiguity of this nature can only be interpreted in a State's favor.  Though the majority is correct that this "case illustrates the nuances of our federalist system of government," Maj. Op. 10, the majority misunderstands that Arizona's sovereign interests must prevail in this case, and this court is precluded from applying *Chevron* deference to the Secretary's interpretation.  The majority's decision to remand (and set the stage for unwarranted *Chevron* deference) eviscerates the very political protections on which the Supreme Court relied when it decided in *Garcia* that States can protect their sovereign interests through the political process.

**III**.

Because both the plain language of the Gila Bend Act and the canon of construction favoring a State's interests requiring an interpretation of "within the corporate limits" contrary to that of the Secretary, I must respectfully dissent.